## MARSHALL v. SALT LAKE CITY et al.

No. 6503.   Decided September 25, 1943.   (141 P. 2d 704.)

*E. R. Christensen, Gerald Irvine,* and *A. Pratt Kesler,* all of Salt Lake City, for appellants.

*Hurd & Hurd,* of Salt Lake City, for respondent.

*E. A. Walton,* amicus curae, for Gibbs.

LARSON, Justice.

Can a city, as a part of a general zoning plan, create small general utility zones throughout residential districts, for the purpose of placing within convenient distance of the inhabitants of the residential district certain small businesses, handling daily conveniences and necessities for the home?

That is the real question involved in this appeal. The questions presented on the record, and argued as grounds for reversal of the judgment, are more specific, and may be stated thus:

1. Was the court in error in hearing the matter under plaintiff's pleadings?

2. Is the city's zoning plan, as evidenced by the zoning ordinance, invalid under the statutes?

3. Was the city's power to zone limited by the contractual business restrictions in the recorded deed to the property owned by Gibbs?

Plaintiff commenced this action at the instigation of a group of residents of the southeast bench section of Salt Lake City, for the purpose of obtaining an interpretation by the court, of certain provisions of the zoning ordinance of Salt Lake City. That ordinance had its historic origin prior to 1920, when the city commission, by ordinance, established a city planning commission and commenced the preparation of a comprehensive zoning plan.

Tentative plans were prepared by 1924, and a series of sectional and general public meetings held from May 1925 to September 1927, during which time the sectional plans were consolidated into one general zoning plan for the whole city. In 1925, the State Legislature enacted a law granting to Utah cities the power to zone the cities and make regulations governing the same. This was known as Chap. 119, Laws of Utah 1925; became Art. 3, Chap. 15, R. S. U. 1933; now U. C. A. 1943, Title 15, Chap. 8, Art. 3. In May 1927, pursuant to this statute, the city commission enacted an ordinance creating a city zoning commission. The zoning commission, after public hearing, submitted to the city commission a plan for the zoning of the city into Use Districts. In August 1927, the city commission adopted an ordinance embodying such zoning plan and regulations governing the same, dividing the city into seven Use Districts, designated as: 1. Residential "A". 2. Residential "B". 3. Residential "B2". 4. Residential "C". 5 Com-

mercial. 6. Industrial. 7. Unrestricted. The only uses permitted in Residential "A" districts were one and two family private dwellings, schools, churches, libraries, parks, farming and truck gardening. Uses permitted in Residential "C" districts, in addition to all uses permitted in Residential "A", included retail shops, fire and police stations, banks, theatres, lunch rooms, drug stores, shoe repair shops, barber shops, garages and service stations. These are the only two district classifications with which we are concerned in this action. The southeast bench section of the city, being that part east of Thirteenth East Street, and south of Sunnyside Avenue, is generally, with the exceptions hereinafter noted, and which give rise to the action, classified and designated as Residential "A". At that time is was sparsely settled, and within it were four places where there was small residential utility business operating. The main thoroughfares in the section, which are designated in the city's traffic regulations as "through streets," were 9th, 13th, and 17th South Streets, and 13th, 15th, 17th and 21st East Streets. The zoning ordinance designated as Residential "C" that land then being used for business uses permitted in Residential "C," and also designated as Residential "C," a small area on each corner of the intersections of the aforementioned thoroughfares in the district.

The plaintiff is the owner of Lots 2, 3, and 4 (50 foot lots) facing west on 17th East Street; the north side of said lots being 51 feet south of the southeast corner of the intersection of 13th South Street and 17th East Street. Plaintiff owned these lots prior to the adoption of the zoning ordinance, at which time there was a dwelling house on the center lot (No. 3). In 1931, after the adoption of the zoning ordinance, the house was enlarged so part of it was placed upon No. 2, the north lot. Lot No. 1, the corner lot, north of plaintiff's property was owned by one Callister, and will hereafter be referred to as the Callister property, and with Lot 2, the north lot of plaintiff, and the property on the other corners of this street intersection, were zoned

as Residential "C," and were later in 1936 rezoned as Residential "B3," a new classification more restricted than "C," in that it did not permit garages.

The classification of these last mentioned lots so as to permit uses other than family dwellings is the redoubt upon which plaintiff first concentrated his heavy artillery.

The other land involved in the action, and upon the classification of which plaintiff directed his second assault, involved thirteen lots at 19th East Street and Hubbard Avenue, two blocks east and four blocks north of plaintiff's property, and will hereafter be referred to as the Gibbs property. This property, with other lands immediately abutting it, was at one time owned by the Douglas Heights Land and Improvement Company. By warranty deed, recorded in the office of the County Recorder of Salt Lake County, February 1, 1913, in Book "8G" of Deeds, it conveyed to the Hubbard Investment Company some of those lands, including the Gibbs property. The deed contained certain building restrictions, one reading "nor shall any building for business purposes be erected on any of said land." As far as the records show, the building restrictions have never been abrogated, modified or changed. This property, all vacant, was originally zoned as Residential "A". By amendment to the ordinances in 1936, the Gibbs property, along with the Callister property and plaintiff's north lot, was rezoned as Residential "B3". In 1939 Callister and Gibbs made applications to the city for permits to erect upon their respective tracts, types of buildings permitted in Residential "B3," but not permitted in Residential "A". This action, to enjoin such buildings, resulted.

The trial court found for plaintiff and issued a permanent injunction. Defendant appeals. Hereinafter, the parties will be referred to as "Plaintiff" and "the City." From the factual background we consider in order the three propositions wherewith the city assails the judgment.

1. Plaintiff's first complaint in a single cause of action assailed and challenged the validity of the original zoning

ordinance, and of each amending ordinance, on grounds specified in the complaint, directed at the passage of the ordinances, and also at their substance, as being ambiguous, unworkable, and not understandable. It asserted that said ordinances and each of them were wholly null and void; that the city was without any authority to grant the permits sought by Callister and Gibbs; and prayed for a permanent injunction. Defendants demurred to the complaint. Without a ruling on the demurrer, plaintiff filed an amended complaint, setting up two causes of action. The first cause of action pleads the zoning ordinances as generally valid, but assails that part of the ordinance which created within Residential "A" Districts small districts classed Residential "C" and Residential "B3," as beyond the power of the city, and a violation of the statute providing for zoning upon grounds specifically set out, which covers generally the grounds upon which the zoning ordinances in toto were assailed in the original complaint, with some further grounds added. This cause of action is confined and directed rather definitely to the classification of the Callister and other property at the intersection of 13th South and 17th East Streets, as Residential "C" or Residential "B3". The second cause of action in the amended complaint is directed at the action and ordinance reclassifying or redesignating the Gibbs property on Hubbard Avenue as Residential "B3". The amending ordinance making this change is assailed on substantially the same grounds as are urged against the ordinances in the first cause of action (adding only the word "arbitrary" to the three grounds set forth). The prayer as to each cause of action is the same, and substantially the same as the prayer in the original complaint. The City moved to strike the amended complaint on the ground that it was not an amended complaint, but was a departure, and injected and was founded upon a new cause of action. The refusal of the court to strike the amended complaint is the first assignment calling for our consideration. If the city's position is well taken, that would terminate this action,

and the other matters need not be considered. Of course, it is fundamental that an amendment which states an entirely new and different cause of action should not be permitted. But courts may permit amendments which introduce new causes of action or bring in new parties. *Union Pac. R. Co.* v. *Wyler*, 154 U. S. 285, 15 S. Ct. 877, 39 L. Ed. 983; *Allen* v. *North Des Moines M. E. Church*, 127 Iowa 96, 102 N. W. 808, 69 L. R. A. 255, 109 Am. St. Rep. 366, 4 Ann. Cas. 257. The Missouri court held in *Lee's Adm'x* v. *Lee*, 21 Mo. 531, 64 Am. Dec. 247, that the court in its discretion may allow an amendment changing the entire cause. To like effect is *Blackwood* v. *Spartanburg Commandery* No. 3, K. T., 185 S. C. 56, 193 S. E. 195, 121 A. L. R. 1320. But the most that is required by the overwhelming weight of authority, is that a *wholly different* cause of action shall not be introduced. See Limitation of Actions, 34 Am. Jur., par. 260. The statement against new causes of action simply means that a party to a suit may not so change his position as to require the adverse party to meet and answer a wholly different legal liability or obligation from what he was originally called upon to meet. *Klopstock* v. *Superior Ct.*, 17 Cal. 2d 13, 108 P. 2d 906, 135 A. L. R. 318; *Frost* v. *Witter*, 132 Cal. 421, 64 P. 705, 707, 84 Am. St. Rep. 53. This court, speaking through Mr. Justice Folland in *Peterson* v. *Union Pac. R. Co.*, 79 Utah 213, 8 P. 2d 627, 630, said:

"The courts [are not] disposed to a technical or narrow construction where the transaction alleged in the amendment is the same as in the original complaint." Citing *Texas & P. R. Co.* v. *Cox*, 145 U. S. 593, 12 S. Ct. 905, 36 L. Ed. 829.

We there further stated:

"When we compare the amendment with the original complaint in the light of the foregoing rules, we think there is such an identity of the cause of action as justifies us in holding that the amendment does not state a new or different cause of action."

Applying these tests to the pleadings in the instant case, we find the same relief sought upon the grounds that the city exceeded its authority in making a zoning ordinance which would permit, and in proceeding thereunder to issue, permits to Callister and Gibbs to construct business houses on property near Plaintiff's home. In each case an injunction was sought to prevent the issuance of permits for the buildings and to declare the ordinance invalid, insofar as it applied to the plaintiff and his property with reference to "B3" uses adjoining him. The original complaint pleaded the invalidity of the ordinance as a whole, but of course plaintiff was in no position to attack it except as it affected him and his property. The grounds of attack were substantially the same, and the defenses would be substantially the same. Plaintiff in the amended complaint just asked for a little less. The city could not be hurt thereby. The trial court was not in error in denying the motion to strike.

2. Are those provisions of the city zoning ordinances which place the Callister property and the Gibbs property in class Residential "C" or Residential "B3" invalid? The trial court held them invalid as beyond the power granted the city by the statute, and as unreasonable, unlawful, discriminatory and void for five specified grounds set out in the findings. As to the Gibbs property, the court also found that the land was, by deed, under certain building restrictions, which prohibited erection of any business building thereon. The city assails these findings as to every point in urging a reversal of the judgment.

Were the city zoning ordinances to the extent that they provided for small spot Residential "C" or Residential "B3" districts within Residential "A" districts a violation of the statute requiring a comprehensive zoning plan? The point argued here is whether the provisions of the ordinance creating these very small areas for limited business purposes detached from "C" or "B3" districts constitute "spot zoning," and not zoning districts. The statute authorizing city zoning was first enacted in Chapter 119, Laws of Utah

1925. It has remained unchanged, and is now Article 3 of Chapter 8, Title 15, U. C. A. 1943, being sections 15-8-89 to 15-8-107. It provides:

15-8-89.

"* * * the legislative body of cities and towns is empowered to regulate * * * the location and use of buildings, structures, and land for trade, industry, residence or other purposes."

15-8-90.

"* * * the legislative body may *divide the municipality into districts* of such number, shape and area as may be deemed best suited to carry out the purposes of this article, * * *"

15-8-91.

"Regulations to Comprehensive Plan. Such regulations shall be made *in accordance with a comprehensive* plan, designed to lessen congestion in the streets, to secure safety from fire, panic and other dangers, to promote health and the general welfare, to provide adequate light and air, to prevent the overcrowding of land, to avoid undue concentration of population, to facilitate adequate provision for transportation, water, sewage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the city."

15-8-92.

"The legislative body municipality shall provide for the manner in which such regulations and restrictions and the boundaries of such districts shall be determined, established and enforced, and from time to time amended, supplemented or changed. * * *"

The trial court held, and the city assails that holding, that the statutory requirements that the city be divided into *Use Districts* has implicit in it the idea that district shall be of considerable size, and intersection corners do not constitute a district as used in the statute. It was also held that "a comprehensive plan" implied that districts must be

comprehensive, that is, of considerable size. The trial court took the position that small areas like those here involved constituted "spot zoning" or "lot zoning," and therefore permitted in restricted districts uses and conditions which the zoning statute sought to prevent. As shown by the above quotes from the statute, the city is authorized to regulate and restrict "the *location and use* of buildings, structures and land for trade, industry, residence and other purposes" and to accomplish this "may divide the municipality into *Districts* of such number, shape and area as may be deemed best suited to carry out the purposes of this Article." (Italics ours.) This is done under the police power and by the statute must be done in accordance with a comprehensive plan, designed, inter alia, to lessen congestion in the street, promote the general welfare, facilitate transportation, and other public requirements. It shall be done with reasonable consideration of the character of the district, its suitability for particular uses "and with a view to conserving  *  *  * and encouraging the most appropriate use of land." Sec. 15-8-91, supra. That the statute contemplates a division and regulation by *districts,* instead of regulation by single lots or small groups of lots, is evident. The regulation of the use of property by lots or by very small areas is not zoning and does violence to the purpose and provisions of the statute. It would not, and could not, accomplish the purpose of the law as set forth in the statute quoted supra. *Wippler* v. *Hohn,* 341 Mo. 780, 110 S. W. 2d 409; *Mueller* v. *C. Hoffmeister Undertaking & Livery Co.,* 343 Mo. 430, 121 S. W. 2d 775; *Guaranty Const. Co.* v. *Town of Bloomfield,* 168 A. 34, 11 N. J. Misc. 613; *Linden Methodist Episcopal Church* v. *City of Linden,* 113 N. J. L. 188, 173 A. 593; *Huebner* v. *Philadelphia Sav. Fund Soc.,* 127 Pa. Super. 28, 192 A. 139; *Wickham* v. *Becker,* 96 Cal. App. 443, 274 P. 397. But it does not necessarily follow that what was here done constitutes "spot zoning" or is violative of the statute. Historically speaking, the leading case on zoning is *Euclid, Ohio,* v. *Ambler Realty Co.,* 272 U. S. 365, 395, 47

S. Ct. 114, 121, 71 L. Ed. 303, 54 A. L. R. 1016, which established the constitutionality of comprehensive zoning plans. It is there said:

"It is enough for us to determine, as we do, that the ordinance in its general scope and dominant features, so far as its provisions are here involved, is a valid exercise of authority, leaving other provisions to be dealt with as cases arise directly involving them. * * *

"The exclusion of buildings devoted to business, trade, etc. from residential districts, bears a rational relation to the health and safety of the community. Some of the grounds for this conclusion are promotion of the health and security from injury of children and others by separating dwelling houses from territory devoted to trade and industry; suppression and prevention of disorder; facilitating the extinguishment of fires, and the enforcement of street traffic regulations and other general welfare ordinances; aiding the health and safety of the community, by excluding from residential areas the confusion and danger of fire, contagion, and disorder, which in greater or less degree attach to the location of stores, shops, and factories. Another ground is that the construction and repair of streets may be rendered easier and less expensive, by confining the greater part of the heavy traffic to the streets where business is carried on. * * *

"The segregation of industries, commercial pursuits, and dwellings to particular districts in a city, when exercised reasonably may bear a rational relation to the health, morals, safety, and general welfare of the community. The establishment of such districts or zones may, among other things, prevent congestion of population, secure quiet residence districts, expedite local transportation, and facilitate the suppression of disorder, the extinguishment of fires, and the enforcement of traffic and sanitary regulations. The danger of fire and the risk of contagion are often lessened by the exclusion of stores and factories from areas devoted to residences, and, in consequence, the safety and health of the community may be promoted. * * *

"* * * The exclusion of places of business from residential districts is not a declaration that such places are nuisances or that they are to be suppressed as such, but it is a part of the general plan by which the city's territory is allotted to different uses, in order to prevent, or at least to reduce, the congestion, disorder, and dangers which often inhere in unregulated municipal development."

To the same effect is *State* v. *City of New Orleans*, 154 La. 271, 97 So. 440, 33 A. L. R. 260. See also *Salt Lake City* v. *Western Foundry & Stove Repair Works*, 55 Utah

447, 187 P. 829; *Smith* v. *Barrett,* 81 Utah 522, 20 P. 2d 864; *Feraut* v. *City of Sacramento,* 204 Cal. 687, 269 P. 537.

City zoning is authorized only as an exercise of the police power of the state. It must therefore have for its purposes and objectives matters which come within the province of the police power. When exercised by a city, it is of necessity confined by the limitations fixed in the grant by the state, and to accomplishment of the purposes for which the state authorized the city to zone. Those purposes, which control and must be subserved by any zoning, are set forth in Section 15-8-91, U. C. A. 1943, quoted supra. The elements required of a zoning plan are: It must be comprehensive; it must be designed to protect the health, safety, and morals of the inhabitants; to promote the general welfare; avoid overcrowding and congestion in traffic and population; facilitate transportation and other public service; and meet the ordinary or common requirements of happy, convenient and comfortable living by the inhabitants of the districts, and the city as a whole. A zoning plan should not be jettisoned merely because it may be vulnerable to attack from one of these "pill boxes." It must be considered as a whole to see if it is designed to accomplish such purpose; if it could promote the general welfare; or even if it is reasonably debatable that it is in the interest of the general welfare, that act should be upheld. The wisdom of the plan, the necessity for zoning, the number and nature of the districts to be created, the boundaries thereof and the uses therein permitted, are matters which lie in the discretion of the governing body of the city. Unless the action of such body is arbitrary, discriminatory or unreasonable, or clearly offends some provision of the constitution or statute, the court must uphold it, if within the grant of power to the municipality. *Miller* v. *Board of Public Works,* 195 Cal. 477, 234 P. 381, 38 A. L. R. 1479; *Sundeen* v. *Rogers,* 83 N. H. 253, 141 A. 142, 57 A. L. R. 950; *Mehlos* v. *City of Milwaukee,* 156 Wis. 591, 146 N. W. 882, 51 L. R. A., N. S.,

1009, Ann. Cas. 1915C, 1102; *Euclid, Ohio,* v. *Ambler Realty,* supra.

The basic purpose of zoning is to

"bring about an orderly development of cities, to establish districts into which business, commerce, and industry shall not intrude, and to fix certain territory for different grades of industrial concerns * * * The exercise [of this power] must have a substantial relation to the public good within the spheres held proper." *White's Appeal,* 287 Pa. 259, 134 A. 409, 412, 53 A. L. R. 1215. "It is a fundamental theory of the zoning scheme that it shall be for the general good, to secure reasonable neighborhood uniformity, and to exclude structures and occupations which clash therewith." *Guaranty Const. Co.* v. *Town of Bloomfield,* supra. See also in *Linden M. E. Church* v. *City of Linden,* supra; *Sugar* v. *North Baltimore Methodist Protestant Church,* 164 Md. 487, 165 A. 703.

It is primarily the duty of the city to make the classifications. If a classification is reasonably doubtful, the judgment of the court will not be substituted for the judgment of the city. *Wippler* v. *Hohn,* 341 Mo. 780, 110 S. W. 2d 409. But the principle is fundamental that the city, in zoning, must do so by districts and not by *indiscriminate* spot zoning. *Mueller* v. *C. Hoffmeister Undertaking & Livery Co.,* supra. But the requirement that zoning be by districts does not require that districts be confined and rigidly limited to one particular type of use.

Zoning is done for the benefit of the city as a whole, and the limitations imposed on respective districts must be done with a view to the benefit of the district as a whole, and not from consideration of particular tracts. *Michigan-Lake Bldg. Corp.* v. *Hamilton,* 340 Ill. 284, 172 N. E. 710; *Whippler* v. *Hohn,* supra; *Mueller* v. *C. Hoffmeister Undertaking & Livery Co.,* supra. Said the Massachusetts court in *Leahy* v. *Inspector of Buldings of City of New Bedford,* 308 Mass. 128, 31 N. E. 2d 436, 438:

"The establishment of zoning districts is based upon the physical characteristics of substantial areas and their suitability for use for certain purposes in view of the present and future requirements of the public health, morals, safety and general welfare."

Metzenbaum in his Law of Zoning, page 144, after discussing the need for zoning ordinances to eliminate the evils of "mixed" streets and intermingled classes of uses, prophetically views the future when he says:

"The benefits of preceding legislation would be defeated and would prove to be of comparatively little view in meeting the newest conditions of American life, unless the police power would prove elastic enough to meet these most recently created conditions.

"Today a much broader line of procedure is required, a wider course of action and a *more far reaching plan,* if the welfare of the people is to be safeguarded, and this broad, wide and embracing plan, finds not a panacea, but its best expression, and its wisest utilization in regulating the use for which territories may be employed."

And again, on page 129, the same author speaking of the creation of districts says:

"In a comprehensive plan, the whole territory of the municipality is divided into districts some of which may be large, some small * * * each with its own standards of use, height and occupancy; each selected by the consideration of the community health and general welfare as applied to that particular district; the whole constituting a comprehensive plan for the best manner of conserving and assuring the greatest safety and welfare of the entire community."

In *Smith* v. *Collison,* 119 Cal. App. 180, 6 P. 2d 277, 278, the California Court said:

"Comprehensive zoning is regulation with forethought to a uniform plan or design to restrict construction and development reasonable and with fairness to each district."

Metzenbaum, on page 149, says it is

"a use districting *reasonably applied* in order to protect the public welfare, safety and health."

The California Court in *Miller* v. *Board of Public Works,* supra [195 Cal. 477, 234 P. 388, 38 A. L. R. 1479], said that the plan must tend to promote the health, safety, morals, and general welfare of the community, in such a

way as "will redound to the welfare of the city as a whole."
The preservation of the public health, morals, safety and
welfare are not to be determined or gauged in dollars and
cents alone, nor in protection from contagious diseases or
moral charlatans. The public health involves the preserva-
tion of the mental, moral, and civic health of the inhabi-
tants as well as physical health. A citizenry mentally alert
and alive to the interests of the city and its inhabitants,
filled with pride and confidence in the community and
nation, awake to its weaknesses, needs and possibilities,
is as much a matter of public concern and effort, as is the
prevention of epidemics. Again, a mentally healthy and alert
citizenry is one of the most effective ways of preserving
the public health. So, too, the moral health of the people
is a matter of grave public concern. The higher the sense
of public responsibility, of private citizens and public offi-
cers alike, the greater the assurance of safety in person, lib-
erty, and property. The higher the moral tone, the morale
of the people, the cleaner will be the city, the more beauti-
ful the homes and parks; the more peace and quiet that
abounds, the greater the joy of life and living in the com-
munity. The publc health, safety, morals, and welfare, as
those terms are used with reference to government and its
exercise of police power are inseparably linked to, and
founded upon, the peace of mind, happiness and contentment
of its citizens. A government such as ours is merely a form
for cooperative action, set up by free men, to enable them
to live and operate as a unit, insuring the preservation to
each of life, liberty and the pursuit of happiness, and im-
posing only such restrictions upon the individual as shall
be necessary to preserve and protect the welfare of society
as a whole. A chain is no stronger than its weakest link,
so society is no better or stronger than the units of, and
upon, which it is builded. The unit upon, and out of which
our present society is built is the family and the home.
A basic and very important element in determining public
welfare, especially as applied to regulations and restrictions

governing residences and residential property, is its need or effect upon the homes and home life of the people. It is certainly the perogative, and probably the duty of organized society, to take those measures and do those things which tend to preserve in their beauty, integrity and social force, the homes and homelife of its citizens. Those things, therefore, which contribute or reasonably may contribute to the convenience and enjoyment of the family home, and the homelife of the people generally, in such a way as may affect their health, safety, morals and general welfare are within the scope of the police power, and may properly form the basis for action by the city in zoning.

The creation of residential districts from which industry, commerce and business generally are excluded, is for the quiet and convenient enjoyment of homes and the safety and comfort of the people and especially of the children who make homes and homelife something to be preserved as the soul's anteroom to heaven. As to what restrictions and limitations should be imposed upon property, and what uses thereof should be permitted, has been by the legislature, committed to the judgment and discretion of the governing body of the city. As long as that body stays within the grant, and purposes fixed by the legislature, the courts will not gainsay (its) judgment. In *Walton* v. *Tracy Loan & Trust Co.*, 97 Utah 249, 92 P. 2d 724, 726, we said:

"No one would doubt that the exercise of the zoning power is definitely a legislative function and activity."

The tests of the validity of a zoning ordinance was given by the California Court in Ex parte Ellis, 25 Cal. App. 2d 99, 76 P. 2d 516, at page 518, in this language.

"The tests of validity in such cases are: Does the ordinance bear a reasonable relation to the public health, morals, safety or general welfare; have the districts been created according to a fair and rational plan?"

The same court, in *Zahn* v. *Board of Public Works*, 195 Cal. 497, 234 P. 388, at page 395, says:

"It must be conceded that, where a given situation admittedly presents a proper field for the exercise of the police power, the extent of its invocation and application is a matter which lies very largely in legislative discretion ([State ex rel.] *Carter* v. *Harper*, 182 Wis. 148, 196 N. W. 451 [33, A. L. R. 269]), and we are well satisfied that the weight of authority dealing with the subject of zoning may now be regarded as establishing that 'every intendment is to be made in favor of zoning ordinances, and courts will not, except in clear cases, interfere with exercise of power' thus manifested."

And in *Euclid, Ohio,* v. *Ambler Realty,* supra, we read:

"If the validity of the legislative classification * * * be fairly debatable, the legislative judgment must be allowed to control."

The governing body of the city has a large discretion in determining the plan of zoning. *Stone* v. *Cray,* 89 N. H. 483, 200 A. 517; *Acker* v. *Baldwin,* Cal. Sup., 108 P. 2d 899; *Reschke* v. *Village of Winnetka,* 363 Ill. 478, 2 N. E. 2d 718; *City of Aurora* v. *Burns,* 319 Ill. 84, 149 N. E. 784. Only if its action is confiscatory, discriminatory, or arbitrary, will the court invoke the rule of the decalogue, "Thou shalt not." Here the general zoning plan of the city set within a reasonable walking distance of all homes in Residential "A" districts the possibilities of such homes securing daily family conveniences and necessities, such as groceries, drugs, and gasoline for the family car, with free air for the tires and water for the radiator, so the wife and mother can maintain in harmonious operation the family home, without calling Dad from his work to run errands. To effectuate this objective, there were created, on a definite, unified plan, at the intersections of definite fixed through streets, these small residential utility districts, limited and confined to such uses. Being set up on such a definite and comprehensive plan it cannot be said to be arbitrary or discriminatory. Neither does it come within the scope of the cases dealing with "spot zoning" which are based upon special privileges granted, or restrictions imposed, without regard to a unified plan. The cases relative to "spot zon-

ing" are generally cases where a particular small tract, within a large district was specially zoned *so as to impose upon it restrictions* not imposed upon the surrounding lands, or grant to it special privileges not granted generally, not done in pursuance of any general or comprehensive plan. *Geisenfeld* v. *Village of Shorewood,* 232 Wis. 410, 287 N. W. 683; *State ex rel. Tingley* v. *Gurda,* 209 Wis. 63, 243 N. W. 317; *Rowland* v. *City of Racine,* 223 Wis. 488, 271 N. W. 36, 38; where it was also held that one who attacks a zoning ordinance "must show that it is unreasonable in respect to [his] property." *City of Little Rock* v. *Pfeifer,* 169 Ark. 1027, 277 S. W. 883. The city commission evidently decided that this method would promote the public welfare, by keeping the home as the sphere of the mother's influence, the father's haven of rest, and the children's paradise. It was not for the trial court to say it could not do so. In so acting, it was in error.

3. We come now to the matters involved in plaintiff's second cause of action, which raises issues beyond those discussed above. This relates to the Gibbs property on Hubbard Avenue, and the effect on the issue involved in this action, of the building restrictions imposed by the deed conveying those lands from the Douglas Heights Improvement Company to the Hubbard Investment Company. The Gibbs property, together with other lands adjoining and abutting it, were in 1913 owned by the Douglas Heights Land and Improvement Company. It conveyed the land by warranty deed, recorded in February of that year, to the Hubbard Investment Company, which deed contained certain building restrictions, one reading "nor shall any building for business purposes be erected on said land." As far as the record shows these restrictions have never been abrogated or modified. The zoning ordinance provides that its provisions do not abrogate or annul any covenants running with the land. The trial court held that these restrictions in the deed ran with the land and therefore Gibbs could not build, and the city could not permit him to build business struc-

tures on the land. The city complains of this ruling because: First, Gibbs was not made a party to the suit; second, plaintiff was not a party, nor an assignee of a party, to the covenant; that is, he did not own any of the lands covered by the covenant. In the interest of Gibbs, Attorney E. A. Walton filed in this court a brief amicus curiae in which he further assails the holding of the trial court because the record shows that Gibbs does not deraign his title through the parties to the covenant, but adversely to them, in that Gibbs claims through a tax title, which, it is contended, wiped out, or is free from, the restrictions of the covenant.

That zoning ordinances cannot override, annul or relieve land from building restrictions, or covenants placed thereon by deed is well settled, and in fact is not controverted by the parties before the court. Cases so holding are: *Barrington* v. *City of Sherman*, Tex. Civ. App., 155 S. W. 2d 1008; *Leahy* v. *Inspector of Bldgs.*, 308 Mass. 128, 31 N. E. 2d 436; *Burgess* v. *Magarian*, 214 Iowa 694, 243 N. W. 356; *Vorenberg* v. *Bunnell*, 257 Mass. 399, 153 N. E. 884, 48 A. L. R. 1431; *Dolan* v. *Brown*, 338 Ill. 412, 170 N. E. 425; *Magnolia Petroleum Co.* v. *Drauver*, 183 Okl. 579, 83 P. 2d 840; *Southwest Petroleum Co.* v. *Logan*, 180 Okl. 477, 71 P. 2d 759; *Ludgate* v. *Somerville*, 121 Or. 643, 256 P. 1043, 54 A. L. R. 837; *Jenney* v. *Hynes*, 282 Mass. 182, 184 N. E. 444.

But in the case before us, plaintiff was not the owner of, or interested in, any lands covered by the covenant. It is elemental that such covenants as run with the land are only enforceable by the parties thereto or their assigns. *Purvis* v. *Shuman*, 273 Ill. 286, 112 N. E. 679, L. R. A. 1917A, 121, Ann. Cas. 1918D, 1175; *Barry* v. *Guild*, 126 Ill. 439, 18 N. E. 759, 2 L. R. A. 334. Only such parties can claim the benefits of the covenant. *Jenkins* v. *Chesapeake & O. R. Co.*, 61 W. Va. 597, 57 S. E. 48, 49 L. R. A., N. S., 1166, 11 Ann. Cas. 967; *Beauchamp* v. *Bertig*, 90 Ark. 351, 119 S. W. 75, 23 L. R. A., N. S., 659; 14 Am. Jur. pp. 513, 514, and cases cited. Since plaintiff has no right to enforce the covenant, he is in no position to complain of its violation.

As to what rights, if any, an owner of property covered by the covenants may have against Gibbs, or the right of any such person to enjoin the erection of a business building on Gibbs' property, is not before us and we express no opinion thereon.

Judgment reversed and cause remanded to the District Court for proceeding consistent with this opinion. Costs to appellant.

McDONOUGH, Justice (concurring in the result).

I concur in the result. The designation of the described tracts at the intersecting through highways, as described in the opinion of Mr. Justice LARSON, as Zone "C" Districts, cannot be said as a matter of law not to have been made in accordance with a "comprehensive plan" designed "to promote the health and general welfare;" nor can it be said not to have been done with reasonable consideration of the character of the district in question and its peculiar suitability for the particular uses to which the ordinance permitted it to be devoted. This being so, it is not our province to interfere with the legislative discretion which placed such districts in that particular zone.

I concur in what is said in the opinion relative to the second cause of action.

MOFFAT, J., and FAUST, District Judge, concur in the result.

WOLFE, C. J., not participating.

PRATT, Justice, on leave of absence.