SAVILLA BRADFORD PETTIS ET AL., APPELLANTS, V. ALPHA ALPHA CHAPTER OF PHI BETA PI ET AL., APPELLEES.

FILED APRIL 26, 1927. No. 25722.

1. Constitutional Law: POLICE POWER. "The police power, as such, is not confined within the circumscription of precedents, resting upon past conditions which do not cover and control present-day conditions obviously calling for revised regulations to promote the health, safety, morals, or general welfare of the public, and as a commonwealth develops politically, economically, and socially, the police power likewise develops, within reason, to meet the changed and changing conditions, and what was at one time regarded as an improper exercise of the police power may now, because of changed living conditions, be recognized as a legitimate exercise of that power." *Miller v. Board of Public Works*, 195 Cal. 477.

2. ————: "PUBLIC WELFARE." In the development of our civic life, the definition of " public welfare " has also developed until it has been held to bring within its purview regulations for the promotion of economic welfare and public convenience.

3. ———: POLICE POWER. The police power is inherent in the effective conduct and maintenance of government and is to be upheld, even though the regulation affects adversely property rights of some individual. *City of Aurora v. Burns*, 319 Ill. 84.

4. Municipal Corporations: ZONING ORDINANCES: INTERFERENCE BY COURTS. "If considerations of public health, safety, comfort, or general welfare could have justified zoning ordinance, the court must assume that they did justify it, and cannot take issue with the city council." *State v. City of New Orleans*, 154 La. 271.

5. Constitutional Law: POLICE POWER. The police power extends to all the great public needs. "It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare." *Noble State Bank v. Haskell*, 219 U. S. 104.

6. Municipal Corporations: POLICE POWER. The right of the legislature to clothe the city with power to adopt a zoning ordinance is derived from that undefined branch of government known as the police power, which by some writers is said to bear the same relation to the municipality that the principle of self-defense bears to the individual.

7. Constitutional Law. "While the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet new and different conditions." *Village of Euclid v. Ambler Realty Co.*, 272 U. S. 365.

8. Municipal Corporations: ZONING ORDINANCES. "If the validity of legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." *Village of Euclid v. Ambler Realty Co.*, 272 U. S. 365.

9. ———: ———: VALIDITY. Zoning law, drawn in general terms and providing reasonable margin to secure effective enforcement, will not be held invalid because individual cases may turn out to be innocuous in themselves. *Village of Euclid v. Ambler Realty Co.*, 272 U. S. 365.

APPEAL from the district court for Douglas county: CHARLES LESLIE, JUDGE. *Reversed, with directions.*

*Kennedy, Holland, DeLacy & McLaughlin, John F. Moriarty* and *Dana B. Van Dusen,* for appellants.

*Stout, Rose, Wells & Martin, contra.*

Heard before GOSS, C. J., DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

DEAN, J.

Omaha is a city of metropolitan class and has a population of upwards of 200,000 inhabitants.    January 23, 1924, by appropriate prior proceedings by the city authorities, a comprehensive zoning ordinance which included the entire city within its scope, and which had theretofore been recently adopted, became of full force and effect.    See sections 3611-3623, Comp. St. 1922.    The city zoning districts are designated "A," "B," "C," "D," and "E," districts, respectively.

A Greek letter society, namely, the Alpha Alpha chapter of Phi Beta Pi, hereinafter called the fraternity, on June 1, 1926, or almost two and a half years after the zoning ordinance became operative, sought to establish a chapter house in the "A" residence district as a rooming house for 20 or 30 young men, students of the Creighton University of Omaha.    To this end the fraternity bought a suitably large residence property, on the last above date, from Mrs. Katherine C. Allison for $25,000, and of this sum $6,000 was paid at the time and a $19,000 mortgage was given by the vendee fraternity to the vendor to secure the unpaid remainder. July 31, 1926, Mrs. Savilla Bradford Pettis, Mrs. Minnie L. Higgins, and Mrs. Alice Kountze, plaintiffs, alleging certain financial interests, as owners of three valuable residence properties in the "A" district, in which they respectively resided, joined in bringing this injunction suit in Douglas county for the enforcement, against the fraternity, of a certain restrictive provision in the "A" zoning district section of the ordinance, which will be more fully noticed later.    Plaintiffs prayed that the "defendant fraternity and each and every one" of its members be enjoined from moving into the house as roomers or lodgers therein, "or from leasing and renting said house as a fraternity house or a lodging and rooming house," and from letting the rooms

for such purpose. On the same day that plaintiffs' petition was filed, a city ordinance being involved, the city of Omaha, hereinafter called the city, filed a petition of intervention and therein prayed for substantially the same relief as that prayed for by plaintiffs, and for such other, further and different relief as equity and justice may require. For convenience, the above named plaintiffs and the city, unless otherwise respectively designated, may hereinafter be called plaintiffs. October 18, 1926, the trial court found in favor both of the fraternity and the intervening defendant Mrs. Allison. Plaintiffs appealed from the judgment of the district court.

Following is section 2 of the 1924 zoning ordinance, No. 11989, so far as applicable here:

"Use District Regulations. In order to regulate and restrict the location of trades and industries and the location of buildings erected or altered for specified uses, the city of Omaha is hereby divided into 'use districts,' of which there shall be five, known as: 'A'—residence district, 'B'—residence district, 'C'—commercial district, 'D'—industrial district, 'E'—unrestricted district. * * * Except as hereinafter provided, no building shall be erected or structurally altered, nor shall any building or premises be used for any purpose other than is permitted in the use district in which such building or premises is located."

Section 3 of the ordinance, so far as applicable here, contains the following provisions which relate more particularly to the residence district in which the house in suit is situate:

"In the 'A' residence district no building or premises shall be used and no building shall be hereafter erected or altered, unless otherwise provided in this ordinance, except for one or more of the following uses: 1. One and two-family dwellings. 2. Churches. 3. Schools, elementary and high. 4. Libraries, museums, parks, playgrounds, branch telephone exchanges and community buildings owned and controlled by the municipality. 5. Farming and truck gar-

dening. 6. Hospitals or institutions of an educational, philanthropic or eleemosynary nature. 7. Accessory buildings * * * including one private garage when located not less than sixty (60) feet from the front line or within or attached to the dwelling. * * * 8. Uses customarily incident to any of the above uses when located on the same lot and not involving the conduct of a business; including home occupation not involving the conduct of a business on the premises," and so on.

Counsel for defendants contend that the "A" district is not in fact a "strictly private residential district." Very true. But it is not shown that any of the buildings referred to were established therein after the ordinance became effective. They also argue that Mrs. Allison "had and has a right to sell" the property to the fraternity "for its exclusive residential use as a family" within the meaning of the city ordinance. The ordinance, however, does not appear to uphold counsel's construction of the word "family" as used in the above cited "A" residence district section. Has it come to pass that a company of approximately 20 or 30 unrelated young fraternity men can properly come within the generally accepted meaning of the social unit which is designated as a family? We do not think so. And counsel's contention in respect of the "family rights" feature of the defendant fraternity is plainly negatived by the express provision that "fraternities," and other designated occupants as well, may be installed under the "B" section of the ordinance. Clearly the fraternity is confined to the "B" section.

Plaintiffs point out that, if the judgment of the trial court is sustained, the students will lodge in the Allison house and be served with two meals each day. And, of course, from time to time more room will be added to accommodate the future influx of students in attendance at a large, influential and rapidly growing university. Plaintiffs also contend that such use of the house "will cause

confusion on account of the numbers living in said house; will depreciate the value of the plaintiffs' property, and other property in the neighborhood; will cause confusion because of the presence of automobiles owned by members of said fraternity and, because of the proximity of the plaintiffs, the first named plaintiff being within 20 feet of said house, and the others being immediately across the street therefrom, plaintiffs will be specially damaged" by reason of its proximity. It is shown that "these three homes are all of the value of over $50,000 each, and are typical of the district," and that many like residences will be greatly depreciated in value in the event that the defendants prevail in this suit.

Plaintiffs gladly concede in the brief that the proposed young men occupants of the defendant fraternity house are high-class and well-behaved in their demeanor. But it will be presumed that they are not different from an equal number of young men students in somewhat similar situations at other seats of learning. *Hannan v. Harper*, 189 Wis. 588, is a case arising in Milwaukee wherein the court made this observation: "The occupancy of the upper flat of the dwelling house as headquarters and clubrooms of a college fraternity amounts to a constructive eviction of the tenant of the lower flat and a breach of an implied covenant for quiet enjoyment, entitling the tenant to an injunction to restrain such breach." And in the statement of facts, speaking of college students generally, the court observes that it is a matter of common knowledge and well established that groups of students are for the most part exuberant, boisterous, and hilarious, and that they do not ordinarily keep regular hours and are addicted to the use and abuse of vibrant and sonorous musical instruments.

It is to be borne in mind that the record does not present a case wherein a litigant is seeking to maintain a right of occupancy within a zoning district, which accrued before the ordinance became effective. Defendants were

not deceived in the premises.  They knew, or were charged with knowledge, of the adoption of the zoning ordinance for more than two years before the house was purchased or a move was made to establish a "fraternity" residence within the confines of the "A" residence district.  There is, of course, some difference of opinion and some conflict in respect of the subject under discussion here. But the courts generally agree that city zoning is based, in part, on the application of the police power to each individual situation.  Counsel for the city of Omaha point out that the Omaha city planning commission consulted with experts on zoning propositions, and that the commission and the city counsel held public hearings, and that in pursuance of the recommendation of the city planning commission, and as an outgrowth of the public hearings, the city enacted the city zoning ordinance in suit.  See sections 3611-3623, Comp. St. 1922.

In a zoning case decided in 1925, the question of the police power as relating thereto, is discussed at length, and the court, in an unusually instructive opinion, say:

"The police power, as such, is not confined within the circumscription of precedents, resting upon past conditions which do not cover and control present-day conditions obviously calling for revised regulations to promote the health, safety, morals, or general welfare of the public, and as a commonwealth develops politically, economically, and socially, the police power likewise develops, within reason, to meet the changed and changing conditions, and what was at one time regarded as an improper exercise of the police power may now, because of changed living conditions, be recognized as a legitimate exercise of that power.  In its inception the police power was closely concerned with the public peace, safety, morals, and health, without specific regard for the general welfare, but the increasing complexity of our civilization and institutions later gave rise to cases wherein the promotion of the public welfare was held by the courts to be a legitimate object for the exercise of

the police power, and as our civic life has developed, so has the definition of 'public welfare,' until it has been held to embrace regulations to promote the economic welfare, public convenience and general prosperity of the community." *Miller v. Board of Public Works,* 195 Cal. 477.

In *City of Aurora v. Burns,* 319 Ill. 84, the court held to the basic principle that the police power is inherent in the effective conduct and maintenance of government and is to be upheld even though the regulation affects adversely property rights of some individual. And in *State v. City of New Orleans,* 154 La. 271, it was held: "If considerations of public health, safety, comfort, or general welfare could have justified zoning ordinance, the court must assume that they did justify it, and cannot take issue with the city council." In *Noble State Bank v. Haskell,* 219 U. S. 104, Mr. Justice Holmes observed: "It may be said in a general way that the police power extends to all the great public needs. * * * It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."

*Barrett v. Rickard,* 85 Neb. 769, has to do with the establishment of an excise ordinance, and it was there held: "The right of the legislature to clothe the city with power to adopt the rule in question is derived from that undefined branch of government known as the police power, which by some writers is said to bear the same relation to the municipality that the principle of self-defense bears to the individual."

Defendants cite *White's Appeal,* 287 Pa. St. 259. It appears that White converted an open front porch into a room, and in so doing he violated the prescribed setback line of a zoning ordinance. The Pittsburgh city officials ordered the removal of the porch. The common pleas court held for the city, but the supreme court, on appeal, reversed the judgment and held, in substance, that the porch, whether open or closed, was neither offensive to the eye

nor a source of sickness, nor did it materially increase or decrease the fire hazards. We are not convinced that the above case is in point.

*State v. Edgecomb,* 108 Neb. 859, 27 A. L. R. 437, is also cited by defendants, but we do not think it is applicable here. The *Edgecomb* case is one of first impression here, and is a comparatively early decision in city zoning litigation, and it dealt with only one feature of the Omaha zoning ordinance then in effect. Under the surrounding facts and the environment there involved, it was held that, to confine the relator to the use of 25 per cent. of its lots area, as the ordinance then prescribed, was so restrictive as to be an unreasonable exercise of the power granted by the legislature. The judgment of the trial court compelled the issuance to the relator of a permit, as requested, for the erection of a church edifice which would cover 37½ per cent. of the two lots, and the judgment was here affirmed.

In an opinion decided November 22, 1926, in respect of city planning and zoning and its recent rise and its application to cities generally, these subjects cannot be better stated than in the language of Mr. Justice Sutherland, in an exhaustive opinion in the case entitled *Village of Euclid v. Ambler Realty Co.,* 272 U. S. 365. In respect of its development, he said:

"Building zone laws are of modern origin. They began in this country about 25 years ago. Until recent years, urban life was comparatively simple; but, with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been re-

jected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it. is impossible that it should be otherwise." Continuing, the opinion holds: "If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." "Zoning law, drawn in general terms and providing reasonable margin to secure effective enforcement, will not be held invalid because individual cases may turn out to be innocuous in themselves." (47 Sup. Ct. Rep. 114.) The opinion further holds that, in city zoning cases, it is not "the province of the courts to take issue with the council. We have nothing to do with the question of the wisdom or good policy of municipal ordinances. If they are not satisfying to a majority of the citizens, their recourse is to the ballot—not the courts." (Quoting from State v. City of New Orleans, 154 La. 271.) The weight of judicial authority clearly appears to support the proposition that, before a zoning ordinance can be declared unconstitutional, such ordinance must be either an arbitrary or an unreasonable pronouncement of the council, or it must be without substantial relation to public health, safety, morals, or general welfare. The conclusion is that the zoning ordinance here is well within the recognized exercise of the police power, and that in the application of its provisions to the property of the defendant it does no violence to the due process guaranties of the state or federal constitutions.

The judgment of the district court is reversed and the

cause is remanded, with directions to enter a judgment in conformity with the views expressed in this opinion.

REVERSED.