**CHICO CORPORATION, Appellant (Petitioner below),**

v.

**DELAWARE–MUNCIE BOARD OF ZONING APPEALS, (whose true identity is Delaware-Muncie Metropolitan Board of Zoning Appeals), Riverside-Normal City Neighborhood Assn., Inc., David A. Taylor, Melvin O. Wilson, Raney Kent Irwin, Joseph C. Mumpower, Leo Mench, Martha Sue Gaylor, Robert D. Gaylor, and Betty Raines, Appellees (Respondents below).**

No. 2–882A243.

Court of Appeals of Indiana, Second District.

July 31, 1984.

William F. Lemond, Indianapolis, George E. Purdy, Greenwood, for appellant.

John M. Feick, Robert S. Koor, Muncie, for appellees.

SHIELDS, Judge.

Plaintiff-appellant Chico Corporation (Chico) appeals the trial court's judgment in favor of defendant-appellee Delaware-Muncie Board of Zoning Appeals (BZA). Chico raises two issues on appeal:

1) whether the trial court's judgment is based on erroneous findings of fact, and

2) whether the trial court's judgment upholding the application of the Student Social Service district zoning performance standards to Chico's property constitutes an unconstitutional taking of property.

Judgment affirmed.

On April 3, 1981, the Administrative Zoning Officer for Muncie refused to issue Chico a permit to remodel the interior of a residence for the purpose of housing members of a fraternity. The residence is in a Student Social Service Zoning District (SSS), a zoning classification which permits fraternities and sororities, single and two-family dwellings, and buildings owned and operated by a college, university, or institution of higher learning. The improvement permit was refused because the lot on which the residence is located is less than one acre, the front setback is less than seventy-five feet, and the side yards are less than twenty-five feet, as required by SSS zoning performance standards.

The denial of the improvement permit was appealed by Chico to the Delaware-Muncie Metropolitan Board of Zoning Appeals; the Board of Zoning Appeals upheld the denial of the improvement permit. Chico filed a Petition for Writ of Certiorari which was granted by the Delaware Circuit Court. The court issued findings of fact, conclusions of law, and a judgment in favor of BZA.

I.

▮ The first issue raised by Chico is whether the judgment is contrary to law in that it is based on erroneous findings of fact. Chico claims the following findings are erroneous and, therefore, cannot be considered by this court as support for the trial court's judgment:[1]

"8) That 900 Beechwood is within an SSS zone, is located near the campus of Ball State University and the Zone conatins [sic] 13 sororities and fraternities and various single-family and two-family dwellings, the surrounding area being generally residential. 9) That ... [Chico] was aware of the restrictions contained in the zoning ordinance applicable to fraternities and sororities in an SSS zone at the time of purchase."

Record at 377.

▮ When the trial court makes special findings we affirm the judgment unless we are satisfied those findings are clearly erroneous. The trial court's judgment is

---

1. Chico also argues finding number fifteen (15) is erroneous. However, we do not address this asserted error because Chico failed to raise that issue in its Motion to Correct Error. Ind.Rules of Procedure, Trial Rule 59(D).

set aside only in instances where the evidence is without conflict and can lead to but one result and the trial court has reached an opposite conclusion. *City of Anderson v. Associated Furniture*, (1981) Ind., 423 N.E.2d 293.

■ Finding eight is not clearly erroneous. A reasonable reading of finding eight (8) is the trial court used the word "area" to describe the neighborhood surrounding the SSS zone rather than the zone itself. The evidence is the particular SSS zone in which the subject property is located covers a 2 by 3 block area which is surrounded by residentially zoned areas. In fact, the professional appraiser employed by Chico reported to Chico the "neighborhood is mainly one and two family dwellings with scattered apartment buildings, and several social fraternal organizations." Record at 92.

■ Similarly, finding nine, that Chico was aware of the restrictions contained in the zoning ordinance at the time of purchase, is correct. Persons are charged with knowledge of the law, including the content of zoning ordinances. *See State ex rel. Marich v. Lake Superior Court*, (1980) 273 Ind. 590, 407 N.E.2d 233. Thus, Chico "knew" of the applicable performance standards, and, consequently, the trial court's finding nine is correct.

## II.

Chico claims the enforcement of the SSS performance standards with respect to its property constitutes an unconstitutional taking because the performance standards are arbitrary and capricious in that they exceed the legitimate scope of the police power.

■ The party challenging the constitutionality of an otherwise valid enactment bears the burden of persuasion in the trial court and on appeal. *Shettle v. McCarthy*, (1981) Ind., 423 N.E.2d 594. An ordinance is clothed with a presumption of reasonableness that casts upon the objector the burden of proving the performance standard bears no substantial relationship to the health, safety, or welfare of the community, or is unreasonable, arbitrary, or capricious. *Goldblatt v. Town of Hempstead, New York*, (1962) 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130; *Houser v. Board of Commissioners of County of DeKalb*, (1969) 252 Ind. 312, 247 N.E.2d 675; *Hills v. Area Plan Commission of Vermillion County*, (1981) Ind.App., 416 N.E.2d 456, 457.

The evidence presented by Chico consists of the following: Less than thirteen (13) acres in close proximity to the campus of Ball State University are zoned SSS; none of the thirteen (13) fraternity houses which exist within the SSS zoned areas comply with all six developmental standards.[2] The *particular* SSS zone in which the subject property is located covers a 2 by 3 block area surrounded by residentially zoned areas. Nine (9) fraternities have houses in this area which predate the enactment of the subject ordinance. Of the nine, three (3) fail to comply with the acreage standard, five (5) fail to comply with the front yard standard, and only one (1) complies with the side yard standard. The block in which the subject property is located contains three (3) residences used by one fraternity, one (1) boarding house, and the subject property, previously used as a single family residence. The one (1) fraternity in the block does not comply with the front and side yard standards.

**2.** The relevant zoning ordinance, Article XXVII, § 2–5, provides:
"LOT WIDTH AND AREA
The width of a lot shall be not less than one hundred (100) feet. The area of such lot shall be not less than one (1) acre.
FRONT YARD
There shall be a front yard of not less than seventy-five (75) feet.
SIDE YARD

There shall be two (2) side yards, each twenty-five (25) feet in width. However, no building shall be closer than fifty (50) feet to any dwelling....
REAR YARD
There shall be a rear yard of not less than fifty (50) feet in depth measured at right angles to the rear lot line."
Record at 255–256.

The residence in question is located on a corner lot, has a side yard of nineteen feet to the abutting sidewalk of Pauline Street on the east, a sixty-seven foot side yard to the west with a four-foot-high board fence separating it from the adjoining property, a thirty-three-foot front yard set back, and a sixty-foot backyard. The lot contains .3345 acres. The residence can be adapted to all the requirements of the Administrative Building Council of Indiana, the Indiana State Fire Marshal, and the Indiana Board of Health.

Before the purchase of the subject property, Chico obtained a professional appraiser's report which stated Chico's proposed use of the subject property was legal, was its highest and best use, and was one of the uses permitted in the SSS zone.

Chico concedes a zoning ordinance which bears a reasonable relationship to the public health, safety, morals or general welfare of a community constitutes a legitimate exercise of the police power. *Village of Euclid v. Amber Realty*, (1926) 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303. However, it is Chico's position the evidence fails to establish this relationship. We disagree.

In examining the evidence we use a three stage approach: 1) was the exercise of the police power justified? 2) if so, is there a rational relationship between the justifiable end and the means used? and 3) if yes, are the means (*i.e.,* the regulations) reasonable?

### A.

### Exercise of Police Power

■ Our first inquiry is whether the evidence reveals the exercise of the police power was justified. It does.

For example, the remonstrators testified: "We now are faced with parking problems, (not audible) existing parking problems. Every night there is a party, there are cars parked on both sides of the road, they are parked illegally. It's too much, the police are called, it's too much to call them every time, every night ... to come out and remove the cars. One other thing is the litter, beer cans, trash cans, anything that can be disposed of, from a fast food operation or whatever."

Record at 99.

"There is one other point I did neglect and that's the noise aspect, and we do have a tremendous amount of noise, and this noise doesn't quit at 11:00 o'clock. It goes on to midnight and sometimes 2:00 o'clock in the morning. My wife and I have a young child, 6 months, 7 months old, and I don't think it's very conducive to growing up a child in that neighborhood."

.    .    .    .    .

"It will intensify. It will have to.

.    .    .    .    .

"Well, you will have more people. There's nothing, there's more noise, there's nothing to say that because it is, as the application is applied for, 24 students in the dormitory that there is not going to be 90 people using the facility, and when they do that, if it's a fraternity meeting or whatever, it's 90 more people however many active members they have.

.    .    .    .    .

"All right, customarily they have more people there on a regular basis than actually live in the place."

Record at 100, 109.

"They [fraternity hours] are irregular to my hours, and I think that most of the people that live in the neighborhood. "One, I am aware of the problems created by fraternities and I'm speaking generally. I've heard the shouting and the singing most all night, many nights, have been bothered by the loud music and have even notified the campus police and asked them to do something about it. I have observed drunkenness, drunken conduct, and have heard obscenities shouted in the neighborhood. I've seen beer cans and bottles, papers, and so forth scattered throughout the area and not picked up. I've been unable at times to park in my own drive, because of the

many cars on special occasions. I've observed fast and wreckless [sic] driving not only in the street but in the alley. I would like to point out there are six children within 50 yards of this house, the ages range from six or seven months to high school age. It's certainly not a good environment for children, it is not healthy because they need to have an opportunity to be in the street and around the neighborhood. Now I have seen this occur in the fraternities that are already there, and I am not attempting to do anything about those that are already there, but I am making a plea as one of the people in the neighborhood to not permit furthering of this same conduct."

Record at 109–110.

"To focus in on the property to present an illustration in the form of a tape that was made last Saturday morning at 11:20 A.M. in my back yard which is less than 50 yards away from this proposed fraternity, the music you will be hearing is coming from the Beta House which is a good ½ block away from my property.... It's got a good beat, but it's kind of hard to dance to though. My point is simply this. I had a radio on at that time and couldn't hear it, let alone the person who was sitting next to me talking to me. On three different occasions last Saturday afternoon, Mr. Taylor and myself went down to the Beta House and ask that the noise be turned down, it was not."

Record at 111–112.

"In regards to parking in the streets, I would like to say that Beechwood Avenue is an interior street, it is not a main or arterial route like Riverside is where the rest of the fraternities or most of those are located. Twenty-four additional people living in one property on 900 Beechwood will have an adverse effect to the public, health, safety, and general welfare of the children living within a baseball's throw of this property and I would say it would take more than a weak arm to hit the house. I have two small children and I am not a prude and I know that you can't segregate real life experiences from what they are going to be presented with throughout their lives, but I don't see why you have to run it down their throats from 50 yards away. No one is going to be convinced, here in this room, that social fraternities are in the same category with the boy scouts. There are odd hours, loud music, pledge walks, initiation rituals, and, as Mr. Wilson points out, a number of things that relate to parties that do spill onto the effected [sic] areas that are adjacent to properties and, in some cases, urination on bushes, trees, cars, and, in some cases, there has been sex right in the yards of some of my neighbors. Lastly, I would call them perverts. They have tried to invite young children—girls—into their cars. I know there is no escape from this problem, but the likelihood of future events could undoubtedly increase with the intrusion of more people into the area, and this is what I think we've got to focus on. While the 24 dormitory residents are being proposed today, nothing is said about the probability of expanding the house and live-in membership, let alone their guests."

Record at 113.

In addition, the parking problems are further evidenced by Respondent's Exhibits A through O, photographs of the area around the subject property.

Furthermore, special problems relative to the health, safety, morals and general welfare of a community posed by fraternity houses have been the subject of judicial comment. The relationship between the public peace and well-being and fraternity houses was recognized by the United States Supreme Court in *Village of Belle Terre v. Boraas*, (1974) 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797, where the Court said:

"The regimes of boarding houses, fraternity houses and the like present urban problems. More people occupy a given space; more cars rather continuously pass by; more cars are parked, noise travels with crowds."

416 U.S. at 9, 94 S.Ct. at 1541.

The Nebraska Supreme Court in *Pettis v. Alpha Alpha Chapter of Phi Beta Pi*,

(1927) 115 Neb. 525, 213 N.W. 835, said college students in general, and fraternity members in particular

> "are for the most part exuberant, boisterous and hilarious and ... do not ordinarily keep regular hours and are addicted to the use and abuse of vibrant and sonorous musical instruments...."

213 N.W. at 838.

We conclude there is evidence of special problems occasioned by fraternity houses to the public health, safety, morals or general welfare that legitimize the exercise of the police power.[3]

### B.

### Rational Relationship

■ The next question is whether the regulations are rationally related to the elimination or amelioration of the special problems. There is such a relationship between the special problems and the regulations.

The subject performance standards favorably affect the public health, safety, morals and welfare by ameliorating the impact of fraternity houses on the surrounding residential areas and, for that matter, on other fraternity houses. The performance standards serve as a buffer against the noise, traffic, and congestion problems associated with fraternity houses. The particular acreage and setback limitations both limit the number of fraternity houses that can fit into the SSS area and assure any new fraternity houses will be physically remote from surrounding residences and other fraternity houses. Obviously, limiting the number of fraternities and distancing them from each other as well as from other residences aids in alleviating problems of noise, traffic, and litter. Thus, performance standards relating to acreage and setback achieve an end that is within the legitimate use of the police power and, in addition, are a means rationally related to the desired end.

### C. Reasonable Means

The final question is whether the performance standards in question are reasonable. Our supreme court, recognizing the impreciseness of a reasonableness standard in *Board of Zoning Appeals of Decatur v. Jehovah's Witnesses*, (1953) 233 Ind. 83, 117 N.E.2d 115, said "its [reasonableness standard] determination must rest upon human judgment applied to the facts and circumstances of each particular case." 233 Ind. at 89, 117 N.E.2d at 118.

Chico argues the instant performance standards are unreasonable because 1) the properties located in the zone cannot realistically comply with the standard, and, in fact, these properties were cast into the status of non-conforming structures, by the enactment of the ordinance and 2) the standards differ depending upon the use made of the property. Again, we disagree.

■ The legislative judgment reflected in the ordinance is that while the particular SSS Zone is not inappropriate for fraternity house usage, nevertheless such usage should not be expanded or enlarged, except in conformity with the performance standards, in order to protect the public health, welfare, and safety. In fact, the legislative judgment may only show deference to the pre-existence of the several fraternities in the area rather than a recognition there is something unique about the area that makes it particularly suitable for

---

**3.** Even as we recognize the special problems associated with fraternity houses, so, too, this court is

> "mindful that in the field of higher education, fraternities and sororities have become and are an integral part of college and university life for many students. The various fraternities point with pride to many successful and illustrious men and women in business, in the professions and in governments, who have brought renown and prestige to the respective

fraternities and sororities in which they held membership."

*Theta Kappa, Inc. v. City of Terre Haute*, (1967) 141 Ind.App. 165, 174, 226 N.E.2d 907, 912. In any event the traditional conflict between students and residents would be benefitted by mutual recognition that college town residents must accomodate their more youthful and exuberant neighbors while the students must accomodate the legitimate rights and privacy of the town citizenry.

that use.[4] Indeed, an acceptable policy of zoning ordinances is to secure the gradual or eventual elimination of nonconforming uses and to restrict or diminish, rather than increase, such uses. *Taylor v. Metropolitan Development Commission of Marion County,* (1982) Ind.App., 436 N.E.2d 1157. Performance standards serve a similar purpose in restricting or diminishing, rather than increasing, structures that do not conform to a comprehensive zoning plan. In any event, the fact an area is deemed suitable for a particular use does not restrict the adoption of reasonable performance standards relating to such use.[5]

■ Furthermore, structures which become non-conforming structures as a result of the enactment of a zoning ordinance differ from those that result from the grant of numerous variances. The variance type of non-conformity may, indeed, demonstrate unreasonableness of the performance standards. However, when the non-conformity results from the enactment of the zoning ordinance it does not demonstrate unreasonableness because the zoning plan is a judgment, prospective in nature, as to future restrictions that will enhance the public health, welfare, morals, and safety. To limit future planning to that which currently exists would be a total emasculation of the police power. This is not to say there are no limitations. The non-conforming "use" (in this case, structure) exception developed by case law and recognized in many zoning ordinances [6] and the requirement of a reasonable nexus between the legitimate end and the means

have been developed to protect property rights from confiscation. Finally, the inapplicability of the existing structural non-conformities as evidence of unreasonableness is manifested by the fact the non-conformities exist only as .to one permissible use (*i.e.,* as fraternity houses) and not to other permissible uses.

More appropriately, the issue is whether the particular performance standards, ·*i.e.,* the one acre minimum, the seventy-five foot front building setback line, and the twenty-five foot side yard lines, exceed or do not achieve the end of ameloriation or elimination of the special problems posed to the public health, safety, morals or welfare by fraternity houses. The record is devoid of evidence of such excessiveness or irrelevance nor does it otherwise appear.

Similarly, the existence of different performance standards within the subject zone, depending upon the use, is not unreasonable. As previously discussed, the impact upon an area occasioned by a fraternity house is different from that of an apartment residence. This difference supports different performance standards. Greater lot size and yard setbacks are reasonably required for fraternities than for single or two family residences or even apartments because the latter do not present the same noise, traffic and congestion problems fraternity houses present. Consequently, there is nothing unreasonable per se about the different performance standards. As this court has said:

> "It has never been denied that in the exercise of the police power, property

---

**4.** However, the contrary may also be the case in that the area is in close proximity to Ball State University which has a sizeable portion of its population in off-campus housing.

**5.** Chico also offered evidence the use of the subject property as a fraternity house was its highest and best use. However, coupling that evidence with the evidence of nonconformity is unavailing to Chico. A property owner is not necessarily entitled to the highest and best use of his property but only to a reasonable use. *City of Anderson v. Associated Furniture and Appliances,* (1981) Ind., 423 N.E.2d 293. *See Metropolitan Board of Zoning Appeals of Marion County v. Sheehan Construction Company,*

(1974) 160 Ind.App. 520, 313 N.E.2d 78. The residence remains available for use as a single residence. The area zoning also permits other uses.

**6.** For example, the subject ordinance provides in part:

> "[W]ithin the zones established in this Ordinance there exists lots, structures, uses or combination of uses and structures which were lawful prior to the enactment of this Ordinance, but which are prohibited, regulated or restricted in this Ordinance. Such uses may continue in accordance with the following provisions...."
> Record at 215.

rights may be sacrificed and privileges curtailed. Since public peace and well being are the object of government, any legislation which furthers these aims will not be defeated on the ground that it interferes with the rights of some of its citizens."

*Combs v. City of New Albany,* (1966) 139 Ind.App. 641, 643, 218 N.E.2d 349, 350–351.

Judgment affirmed.

BUCHANAN, C.J., and SULLIVAN, J., concur.