# PHI KAPPA IOTA FRATERNITY et al. v. SALT LAKE CITY.

No. 7357.   Decided December 6, 1949.   (212 P. 2d 177.)

See 62 C. J. S., Municipal Corporations, sec. 226. Fraternity houses, zoning as to, see note, 168 A. L. R. 64. See, also, 58 Am. Jur. 982.

*Clyde, Mecham & White,* Salt Lake City, for appellants.

*E. R. Christensen,* Salt Lake City, *Homer Holmgren,* Salt Lake City, *A. Pratt Kesler,* Salt Lake City for respondent.

PRATT, Chief Justice.

This case, under our Declaratory Judgment Act, U. C. A. 1943, 104-64-1 et seq., involves the constitutionality of a city ordinance which confines the use of premises in a restricted residential area, for a fraternity or a sorority, to an area not more than 600 feet from the lands and premises occupied by the institution to which the fraternity or the sorority is an incident.

Specifically it involves the premises being purchased and now occupied by the plaintiff fraternity which is one of the fraternities authorized by the University of Utah in Salt Lake City. The plaintiff, Dr. Hatch, is the owner of a home within the 600 foot area, who is complaining of the congestion incident to such a limitation, which, as he claims, adversely affects the value of his premises. It is conceded that the fraternity premises are outside the 600 foot area; and it is conceded that the premises of both plaintiffs are in the restricted residential area designated by the ordinance as District A.

The Salt Lake City ordinance reads:

(Chapter 65, Revised Ordinances of Salt Lake City, Utah, 1944, Section 6715)

"(a) In Residential 'A' district no building or premises shall be used or maintained, and no building shall be erected or altered so as to be arranged, intended or designed to be used for other than one of the following uses:

"1. One-family dwellings.

"2. Two family dwellings.

"3. Schools.

"4. Churches.

"5. Libraries and museums.

"6. Public parks, public recreation grounds and playgrounds, but not including privately owned commercial amusement parks or commercial recreation grounds.

"7. Farming and truck gardening, nurseries and greenhouses, provided that greenhouses shall be set back at least (60) feet from the front yard line.

"8. Railroad or street railway passenger stations and rights of way, not including railroad yards or sheds.

"9. Public buildings, except penal or mental institutions.

"10. Cemeteries adjoining or in extension to existing cemeteries.

"11. Telephone exchange where no public business office and no repair or storage facilities are maintained.

"(b) In a Residential 'A' district buildings and uses, such as are ordinarily appurtenant to any of the uses listed above, but not involving the conduct of business, shall be permitted, subject to the limitations herein provided.

"1. Accessory uses customarily incident to the above uses.

"2. The office of a physician, musician or other professional person, when located in his or her dwelling; also customary incidental home occupations engaged in by individuals within their dwellings, provided that no window display is made.

"3. A name plate not exceeding one and one-half (1½) square feet in area, stating only the name and/or occupation of the person.

"4. A signboard not exceeding eight (8) square feet in area, appertaining to the lease or sale of the property; also a bulletin board not exceeding eight (8) square feet in area erected upon the premises of a church or other institution for the purpose of displaying the name and activities or services therein provided when set back within two (2) feet of the building line.

"5. In a one-family dwelling the renting of rooms to not more than six (6) persons for lodging purposes only, or the furnishing of table board to not more than six (6) persons, or the furnishing of a combination of the above to not more than six (6) persons; provided, however, that these provisions shall not be applicable to a two-family dwelling.

"6. Dormitories, fraternity or sorority houses or boarding houses occupied only by the faculty or students of a public educational institution and supervised by the authorities thereof, subject, however,

to the express condition that such houses shall not be located or established more than 600 feet distant from the lands and premises occupied by the institution to which they are incident.

"7. A private garage that shall occupy not more than seven (7) per cent of the area of the lot and shall be located not less than sixty (60) feet from the front lot line, thirty (30) feet for a corner lot on the side street and not less than fifteen (15) feet from any dwelling on an adjacent lot, unless it is part of the main building or located in a terrace or retaining wall. If located in a terrace or retaining wall, such garage shall not project in front of the terrace or retaining wall and shall not extend above the top of said terrace or retaining wall more than two (2) feet, and in no case above the level of the ground floor of a dwelling on an adjacent lot."

From the north to south the lands and premises of the University extend through an area of four blocks, from 1st South to 5th South, streets running east and west; and from west to east through an area approximately equal to two of the same size blocks, from University Street to the boundary of the Fort Douglas Military reservation. University street runs north and south. This does not take into consideration a new area acquired recently from out the military reservation area. This new acquisition will be mentioned only incidentally in this opinion. The blocks to which we refer are approximately 660 feet long.

The fraternity house in question is something over two blocks north from the northwest corner of the University lands and premises; and the doctor's house is just within the 600 foot area, the 600 foot line just tipping one corner of his lot. It is also north of the University land and premises.

The 600 foot limitation was placed in the ordinance in 1939, pursuant to a petition of property owners near the University in Residential District A area and upon public hearing of that petition, the petitioners requesting a maximum limitation of 1/8 mile. Six hundred feet was adopted because it encompassed all fraternities and sororities of that time except one or two isolated ones. Dr. Hatch owned his property at the time of the petition and hearing. The

plaintiff fraternity purchased its property, however, just recently, and with knowledge of the restriction.

We shall not dwell upon the details of the pleadings or the findings of fact of the lower court. It is sufficient to say that the plaintiff fraternity has been threatened with criminal prosecution if it continues to use its premises as a fraternity; and it instituted this proceeding, along with Dr. Hatch, to test the constitutionality of the ordinance. The lower court concluded that the ordinance was "not unreasonably discriminatory, arbitrary or capricious." Pending the decision the city was enjoined from proceeding with the prosecution of plaintiff fraternity.

Is this limitation a discrimination against the rightful use of their premises by the plaintiffs?

The residential area north of the University, including the locality of the properties of the plaintiffs, has a history of building restriction which has resulted in its becoming one of the finer residential areas of the city. That part of the area immediately adjacent to the University grounds has, of necessity, to put up with a certain amount of inconvenience incident to the gathering of students in and about the University grounds for purposes incident to University life. The noise and the congested traffic, and other such inconveniences, are incident to the maintenance of such an institution—and this quite aside from the presence of fraternities or sororities. As the fraternities and sororities are not centered upon the University grounds, they, of course, gravitate as near the grounds as they can find locations. It is an advantage to them, as well as an advantage to the University authorities who must supervise their activity. As each fraternity or sorority gets located it carries with it to the immediate area of its location part of that noise and congestion and inconvenience and plays its individual part in expanding the over all area of the influence of the institution. As the University has grown in size, the fraternities and sororities have increased, and the area affected with the attending inconveniences increases.

As a result, there arises the question of whether or not a comprehensive plan of zoning should be adopted to restrict this expansion within limits. The petitioners who sought a limitation and obtained the 600 foot limitation in this case, sought to confine this inconvenience to an area of $\frac{1}{8}$ mile immediately adjacent to the University. The commission in granting the 600 foot limitation, took an area of what might be called natural selection—that is, one selected by the great majority of fraternities and sororities when there was no limitation upon their right of selection. Such a selection has a reasonable foundation; but, of course, is not the only solution of the problem that could have been made.

Sections 15-8-89, 90, 91, and 92, U. C. A. 1943, grant the governing body of the city the discretionary power to district and zone cities for various purposes that are to the public interest; and the exercise of that power will ■ not be interfered with by the courts unless the discretion is abused. See the discussion in *Marshall* v. *Salt Lake City*, 105 Utah 111, 141 P. 2d 704, and 149 A. L. R. 282, and in the authorities cited in that case.

Let us then consider some of the objections raised by the plaintiffs.

Their point A alleges discrimination by reason of the fact that paragraph 6 of the ordinance is limited to fraternities or sororities of public schools, and excludes those incident to private schools. If the ordinance allowed fraternities and sororities of private schools to settle anywhere in District A, but restricted those incident to public schools to the 600 foot limit, the plaintiff fraternity might be in a position to raise the question covered by this point; but that is not the picture here. All fraternities or sororities are excluded from the area, except those of public institutions who settled within the 600 foot area. As plaintiff fraternity is not one of a private institution and therefore not discriminated against by reason of the kind of an in-

stitution of which it is an incident this question is purely academic so far as this plaintiff is concerned. Dr. Hatch, of course, does not fit into this picture under either classification; so that, as to him, the question is also academic. Neither plaintiff would benefit from an inclusion of private institutions in the limitation. We see no reason for considering the point. *Utah Manufacturers Association* v. *Stewart et al.*, 82 Utah 198, 23 P.' 2d 229, headnote 8; 2 A. L. R. 2d 918n.

Point B raises the question of discrimination between two-family dwellings permitted in District A and sorority and fraternity houses or dormitories. In advancing this point emphasis has been placed by plaintiffs upon the fact that plaintiffs' fraternity house was a single family residence; and as two-family units can be used for roomers and boarders, there is no practical difference between that situation and a single family residence used by University of Utah students with a common house-keeping unit. They point to the ordinance definition of "Family." It reads:

"Section 6713

"6. 'Family.' Any number of individuals living together as a single housekeeping unit, and doing their cooking on the premises, independent of and separated from any other group or family."

Regardless of the ramifications of argument as to questionable distinctions between one and two family residences, and the number of persons allowed in each, there is a quite a difference between a residence used as a home, whether rented to roomers or boarders or both, or owned, and a fraternity or sorority. The college social and fraternal life about the fraternity or sorority is well known to all; and has, to say the least, much more adverse effect upon the neighboring residences than a mere rooming or boarding house. The collegiate spirit contemplates frequent gatherings with their attendant boisterous conduct. The initiations, the dances, the rallies, and such other evidences of college spirit are absent from the rooming or boarding house—unless, of course, it be a dormitory, and then it is

classed under the ordinance the same as a fraternity or sorority. We see a clear and distinctive reason for not classing the rooming and boarding house the same as the fraternity, sorority or dormitory. *Pettis et al.* v. *Alpha Alpha Chapter of Phi Beta Pi*, 115 Neb. 525, 213 N. W. 835; *City of Lincoln* v. *Logan-Jones*, 120 Neb. 827, 235 N. W. 583. Plaintiff fraternity must fail on this point. As to the plaintiff Dr. Hatch, this point also is academic.

Point C attacks the ordinance as unreasonable upon the ground that it discriminates against the property of the plaintiff Dr. Hatch.

In explanation of the argument on this point the following facts, developed at the trial, are of importance: South of the University there is a cemetery that interferes with the 600 foot area in that direction. East of the University is the military reservation of Fort Douglas, which constitutes another interference. By ordinance the residential area north and within 600 feet of land recently acquired from Fort Douglas, has been withdrawn from occupancy by fraternities and sororities. Of the remaining land, counsel for Dr. Hatch has this to say:

"The area to the east and to the south is closed to students. The area to the north is closed except the 600 foot strip. New fraternal groups as they come upon the campus have two alternatives: (1) They can locate to the west, or (2) they can locate within the 600 foot limit. Regardless of what might be available to the west, the students are in fact, locating within the 600 foot strip. The University has more than doubled in size since 1939, and fraternal groups on the campus are definitely on the increase. The addition of all the fraternal units within this 600 foot strip, without question, results in congested parking, and congested living quarters, and of course, greatly restricts the use by Dr. Hatch of his property.

\* \* \* \* \*

"Every witness who testified on the subject admitted that the parking problem is better met by having the fraternity houses dispersed into wider areas rather than congregated into narrow areas. There was positive evidence that the existing fraternities own 281 cars and operate them around the campus and around their homes, or a total of over 17 cars per house. Certainly it would ignore common sense to contend that the parking problems and congested con-

ditions are better met by having more fraternity and sorority houses crowded into this one congested area. Of course, the city says they could move to the west and farther to the south, where they would be in a 'B' zone, but as a practical matter, the fraternities are not doing so."

There are, of course, various solutions for zoning problems such as this; and opinions may differ as to which is the more efficacious. But it is not for the court to weigh the respective merits of these solutions. That is the duty that lies upon the shoulders of the governing body which is by statute authorized to district and zone cities. The selection of one method of solving the problem in preference to another is entirely within the discretion of the commission; and does not, in and of itself, evidence an abuse of discretion. If changes have developed which indicate that a dispersal of fraternities and sororities will better solve the problem, that is a matter for submission to the commission; and not one for the courts. This point C rather savors of the idea that affirmative action should be taken to force dispersal upon the fraternities and sororities, as the previous history of the area indicates that merely to do away with the present ordinance would open the way for such organizations to completely surround Dr. Hatch's property, whereas, as matters now stand, he has as least some protection to his property on the side which is outside the 600 foot zone. Invalidation of the present ordinance has no potentiality of dispersing the present congestion, and the opening of property near Dr. Hatch's property to fraternities and sororities would probably result in just as much addition to the congestion as if they are forced to select their houses in the restricted area. These questions, however, are for the commission, not the court.

Plaintiffs profess to see nothing pertaining to the health, morals, safety or general welfare in distinguishing between residences of District A within the 600 foot area, and those outside thereof.

As indicated in the *Marshall* v. *Salt Lake City* case, cited above, the expressions "health", "morals", "safety", and "general welfare" of the public contemplate something more than merely the literal translation of each of those terms. The statutes cited above recognize the right to zone; and pursuant to them, cities have zoned certain areas upon the theory of it being to the public interest to do so—such as the various Zones of A, B, etc., in Salt Lake City. Circumstances may be such that there is just as much reason for "spot zoning" within a certain zone, as there is for having that zone declared as an area of limitation within the city. The relationship to the public interest of each form of zoning is considered as falling within the terms of health, morals, safety and general welfare of the public, when such zoning is permissible. We are of the opinion that the present limitation of the 600 foot area is of that class of legislation. See Nebraska cases cited above and citations therein.

As to why the line of separation should fall just where it does with reference to Dr. Hatch's property, probably the best answer is that found in the case of *Wilkins* v. *City of San Bernardino*, 29 Cal. .2d 332, 175 P. 2d 542, 549. It is this:

"* * * Zoning necessarily involves boundary problems and, when 'spot' zoning is permitted in a residential district, the legislative body must determine where the boundary is to be placed, attempting, as far as possible, to minimize the resulting inconveniences. This is essentially a legislative problem, and the determination may be attacked only if there is no reasonable basis therefor. Often there may be little difference in the character of the property on either side of the line, but such a showing will not justify judicial alteration or extension of the boundaries. * * *"

The reasonableness of the present 600 foot boundary lies in the selection of that area because of its inclusion of the great majority of the fraternal houses as they had established themselves without restriction.

Point D claims discrimination upon the theory that the law is directed only against the University, and the fra-

ternity and sorority houses incident thereto. The law is in general terms. It happens that the University is the only institution to which it would apply. Should another come into being, the ordinance would apply equally well to that institution. It is in no sense limited in its application to an institution sitting within the bounds of the premises of the University of Utah. It would apply equally well to such an institution established in the extreme southeast part of the city.

Throughout their brief, plaintiffs have stressed the traffic congestion as a reason for holding the ordinance discriminatory. That argument is highly speculative as to results. The traffic congestion is only one element to consider. In the eyes of the Commission, it may be that, for the general welfare of the area, such congestion would have to take second place in importance as against the peace and quiet of the whole area. Furthermore, the removal of the 600 foot restriction carries with it no assurance that land and/or residences 650 or 700 feet away will not be acquired by these fraternities or sororities. Moving in that close they would not be sufficiently far away to prevent their machines becoming a part of the congested traffic. But again we must say that this question is for the Commission, not the court, to determine. It should be kept in mind that the 600 foot area is not confined to the location of Dr. Hatch's home. It extends west of the campus as well. The 600 foot area must be viewed in the light of a unit, and not piecemeal such as the north part thereof as distinguished from the west. The availability of houses suitable for fraternity or sorority use, or the financial ability of any such organization to purchase land or a house are not grounds for sub-dividing the question of the constitutionality so as to take advantage of the congestion of traffic in the neighborhood of Dr. Hatch's residence. For example: The ordinance can remain in effect and be complied with by a purchase of premises west of the University, which purchase would not affect Dr. Hatch. For that reason it is not logical to say

that to compel the fraternities or sororities to stay within the 600 foot limit would necessarily increase the traffic congestion about Dr. Hatch's property. It might, if those organizations insisted upon locating in his neighborhood; but it would not, if they located west of the University.

The two of plaintiffs' remaining points, E and F, are, in principle, covered by what has already been said. We see no error in the lower court's decision.

It is affirmed. Costs to respondent.

WADE, WOLFE, LATIMER, and McDONOUGH, JJ., concur.