SMITH INVESTMENT COMPANY, a Utah corporation; and Sandy Hills, Inc.; a Utah corporation, Plaintiffs and Appellants,

v.

SANDY CITY et al., Defendants and Appellees.

No. 970008–CA.

Court of Appeals of Utah.

April 30, 1998.

---

246

Clark W. Sessions and Kristine Edde, Salt Lake City, for Appellants.

Jody K. Burnett, Salt Lake City, for Appellees.

Before WILKINS, Associate P.J., and GREENWOOD and JACKSON, JJ.

## OPINION

JACKSON, Judge:

Smith Investment Co. and Sandy Hills, Inc. (Sandy Hills) appeal the trial court's order of summary judgment in favor of Sandy City. We affirm.

## BACKGROUND

"In reviewing a grant of summary judgment, we view the facts in a light most favorable to the party against which the motion was granted. We state the facts ... accordingly." *Sandy City v. Salt Lake County*, 827 P.2d 212, 215 (Utah 1992) (citations omitted).

In 1960, Reed and Barbara Smith bought about twenty-three acres of undeveloped property (the property) on the west side of 700 East Street where it intersects with 9200 South Street in Salt Lake County. At the Smiths' request, the property was annexed to Sandy City in 1960, then rezoned C–2 for commercial use in 1962. The Smiths transferred the property to their company, Sandy Hills, intending to commercially develop the entire property.

Sandy City apparently welcomed the idea of commercial development in that area. On October 12, 1961, the Sandy City mayor sent a letter to Salt Lake County about, among other things, Sandy Hills's proposed development of the property, stating:

> The economic center of [Sandy City] has moved from [8600 South between State Street and 300 East Street,] and Sandy City in June of 1960 after consideration of studies prepared by the University of Utah relating to the economics of Salt Lake Valley, traffic, population, and service requirements, zoned a twenty-five (25) acre tract commercial. This tract is located at the corner of 9300 South and 7th East. In relation to this tract, Sandy City has cooperated with the developers of the tract in order to assure them of a sound economic basis and a representative development.

Beginning around early 1962, Sandy Hills built a shopping center along the east edge of the property, fronting 700 East Street. Over the next several years, Sandy Hills leased its shopping center space to a variety of commercial tenants and left its rear 15.8 acres undeveloped.

In January of 1980, the Sandy City Council (city council) adopted a new development code. Then, the following month, the city council directed the Sandy City Planning Department (planning department) to examine each of the five planning communities in Sandy City to determine whether existing zoning should be changed to reflect the goals and policies of the new development code. The property was located in the Sandy Community.

In September of 1980, the planning department submitted to the city council and the Sandy City Planning Commission (commission) a memorandum entitled, "Zoning Change Recommendations for the Development Code—Sandy Community." In that memorandum, the planning department recommended, among other rezonings, that the rear 15.8 acres of the property (rear acreage) be rezoned, or downzoned,[1] from C–2 to a

---

1. "Downzoning" is defined as "[t]he process by which zoning changes reduce an area's density level or limit the intensity of [development on] designated land.... Downzoning is, in effect, 'rezoning' of a previously zoned section which results in a concurrent decrease in the value of

residential classification. The memorandum listed the following reasons for that recommendation:

1. [T]he Sandy Community Citizens' Report[2] recommended the western portion of the parcel be rezoned to single family residential use;

2. the Sandy City Comprehensive Plan goals and policies recommend to limit the depth of 700 East commercial development to 200 feet unless conditional use approval is granted;

3. the existing 364[,] 500 square feet of retail space exceeds the Commercial/Industrial Study recommendation that Community Commercial should not exceed 250,000 square feet retail space;

4. the stub roads into the parcel create traffic circulation problems in the existing residential and commercial development;

5. traffic from the area when developed should enter and leave through the existing residential subdivision streets and not travel through the commercial center; and

6. good access to commercial or multiple unit development behind the existing commercial development would be difficult.

During a meeting of the city council and commission on September 30, 1980, the planning department introduced the proposed rezonings, including downzoning of the rear acreage. The minutes of that meeting show that—in support of the downzoning of the rear acreage—the planning department suggested,

With the existing commercial it appears there may be excessive commercially zoned land and developed commercial square footage in this area for this type of commercial use development. Additional concerns were over the number of stub

streets that go into the back of the property, existing street pattern and traffic generation and the access to future commercial development.

The minutes of that meeting also show that the commission and city council received a letter from Sandy Hills formally objecting to the downzoning. Sandy Hills further objected to the downzoning through its attorney at a commission meeting on October 16, 1980.

The proposed downzoning was discussed again at a commission meeting on November 6, 1980. There, a member of the commission moved that the rear acreage be downzoned for the following reasons: "[T]he Sandy Citizen's report recommends the area be downzoned, the property has remained undeveloped for at least 20 years, it has residential on 3 sides and [residential zoning] would be an appropriate buffer." After discussing the motion, the commission tabled the matter until a later meeting.

On November 20, 1980, after more comment from Sandy Hills, the commission voted to recommend to the city council that the rear acreage be downzoned. The minutes of that meeting show the following reasons were stated to support the vote: "[T]he Sandy Citizen's report recommends the area be residential, it is directly adjacent [to] residential [property] on three sides of the property, there are adjacent stub streets, there is ample commercial zoning to make an attractive center, and [residential zoning] would be a good buffer."

The minutes of the city council meeting held on February 28, 1981 show that the downzoning was considered during the meeting. Various city council members noted, among other things, that (1) even if the rear acreage was downzoned, "over 6 acres of commercial would exist along 700 East"; and

---

the real estate within the affected area." 1 Julius L. Sackman, *Nichols on Eminent Domain* § 1.42[18][a][vi] (3d ed. 1997).

**2.** In early 1977, the city council had formed the Sandy Community Citizens' Committee. The committee met for two years, identifying problems in their community, generating goals and policies, and sketching out options for developing their community. The ideas arising from these efforts were presented to residents of the community both at a mass meeting in April of

1978 and by questionnaire in early 1979. The Sandy Community Citizens' Report is the result of these efforts. The report, dated April 12, 1979, is self-described as being in three parts:

Part 1 describes the purpose of comprehensive planning and how the citizens' goals and policies fit into the entire scheme; part 2 provides some demographic and land use data; and Part 3, includes the goals and policies developed by the Citizens' Committee and provides a summary of the questionnaires.

(2) because a subdivision adjacent to the rear acreage was experiencing "deteriorating housing and high turnover of owners," downzoning the rear acreage to allow "additional residential development ... might stab[i]lize the neighborhood." The proposed downzoning was remanded for further discussion by the commission regarding the specific residential classification to be assigned to the rear acreage.

On April 2, 1981, the commission listened to more comment from Sandy Hills. The minutes from that meeting show the commission recognized again that the land on three sides of the rear acreage was residential. The commission additionally noted that "the area has experienced high owner turnover in existing homes recently. The recommended zoning could add stability to the area." The commission then voted to recommend to the city council that the rear acreage be rezoned R–2–10.[3]

Finally, on April 18, 1981, the city council amended the zoning map to, among other things, downzone the rear acreage to R–2–10. The Sandy City mayor then approved the downzoning on May 7, 1981.

3. The purpose of R–2–10 zoning was "to provide a residential environment within [Sandy] City which is characterized by somewhat higher densities than single family areas, i.e. single family dwellings interspersed with two-family dwellings. However, other characteristics of single family areas remain the same, i.e. uncrowded buildings, well-kept lawns, trees, and other landscaping, a minimum of vehicular and pedestrian traffic, and quiet residential conditions favorable for family life." Sandy City, Utah, Development Code § 15–12–16(a)(1) (1980). R–2–10 allowed the following uses: "single-family dwellings, schools, churches, parks, playgrounds and other community facilities in harmony with the intent of this zone." *Id.* § 15–12–16(a)(2). R–2–10 also allowed "[t]wo-family dwellings" as a "conditional use." *Id.* § 15–12–16(b).

4. Sandy Hills cursorily raises the takings issue under our state constitution as well, but "does not separately treat or brief the taking issue under the Utah Constitution." *Williams v. Public Serv. Comm'n,* 754 P.2d 41, 53 n. 12 (Utah 1988). "We [thus] do not undertake an independent state analysis." *Bennion v. ANR Prod. Co.,* 819 P.2d 343, 348 n. 9 (Utah 1991).

Sandy Hills also appeals the trial court's entry of summary judgment upholding Sandy City's placement of a barricade closing 1055/1075 East Street where it entered the property. This barricade blocked access to a road placed by Sandy

On March 25, 1988, Sandy Hills brought suit against Sandy City, attacking the downzoning. Sandy Hills asserted before the trial court that—on its face—the downzoning violated its Fifth Amendment rights by both denying it substantive due process and effecting a taking of the rear acreage without just compensation. On cross-motions for summary judgment, the trial court ruled for Sandy City. Sandy Hills appeals.

## ISSUES AND STANDARD OF REVIEW

■ Under its substantive due process claim, Sandy Hills argues that Sandy City's decision to downzone the rear acreage was an invalid use of the city's police power because the downzoning did not rationally advance legitimate goals involving the public's health, safety, or general welfare. Under its regulatory takings claim, Sandy Hills argues that, regardless of whether the downzoning was an invalid use of the police power, the downzoning effectively eliminated all economically viable use of the rear acreage, leaving the rear acreage practically valueless.[4]

Hills on the property. Sandy Hills complains that this was an abuse of the city's police power and a taking, and that the street could not be blocked because the continuation of the street onto its property was a road dedicated to public use by statute. *See* Utah Code Ann. § 27–12–89 (1995).

First, regarding the police power and takings issues, Sandy Hills's briefing provides no meaningful legal analysis, consisting mainly of bald assertions. Thus, Sandy Hills does not even begin to carry its burden of showing that Sandy City's barricading action was constitutionally infirm. *See* Utah R.App.P. 24(a)(9) (requiring brief to contain sufficient legal argument).

Second, we cannot agree with Sandy Hills that it has successfully raised a claim as a matter of law that the road continuing onto its property from 1055/1075 East was dedicated to public use. As with the police power and takings issues, Sandy Hills has not fleshed out its legal arguments beyond bald assertions. Moreover, the statute Sandy Hills cites to support its claim states, "A highway shall be deemed to have been dedicated and abandoned to the use of the public when it has been continuously used as a public thoroughfare for a period of ten years." Utah Code Ann. § 27–12–89 (1995). However, Sandy Hills offers no proof that the road on its property was used by the public continuously for at least 10 years.

Summary judgment is proper solely in cases in which no genuine issues of material fact exist and the movant merits judgment as a matter of law. *See Sandy City v. Salt Lake County*, 827 P.2d 212, 217–18 (Utah 1992). We accord no deference to the trial court's legal conclusions, reviewing them for correctness. *See id.*

## ANALYSIS

■■■ As mentioned above, Sandy Hills challenges just the facial constitutionality of Sandy City's downzoning ordinance.[5] " 'Thus, the only question before this court is whether the mere enactment of the [ordinance] constitutes [a substantive due process violation or] a taking.' " *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 493, 107 S.Ct. 1232, 1246, 94 L.Ed.2d 472 (1987) (citation & emphasis omitted). And, it is Sandy Hills that bears the "heavy burden" of successfully attacking the ordinance. *See id.; accord State v. Gardner*, 947 P.2d 630, 655 (Utah 1997) (Russon, J., dissenting) (citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2099, 95 L.Ed.2d 697 (1987)); *see also* 1 Kenneth H. Young, *Anderson's American Law of Zoning* § 3.16, at 121 (4th ed. 1996) (stating challenger's burden of proof in upsetting zoning ordi-

nance "can properly be described as an 'extraordinary' one"). This is because of our "strong . . . reluctance" to proclaim a legislative action[6] facially unconstitutional. *Salt Lake City v. West Gallery Corp.*, 584 P.2d 839, 840 n. 1 (Utah 1978); *see also Gardner*, 947 P.2d at 655 (Russon, J., dissenting) (" 'A *facial* challenge to a legislative Act is . . . the most difficult challenge to mount successfully . . . .' " (quoting *Salerno*, 481 U.S. at 745, 107 S.Ct. at 2095 (emphasis added))); Daniel R. Mandelker et al., *Federal Land Use Law* § 1.04, at 1–10 (1997) ("Facial attacks on land use regulations . are generally futile . . . ."); 1 Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning & Planning* § 3.05, at 3–41 (1997) ("[C]ourts rarely hold zoning . . . regulations unconstitutional on their face . . . ."). We will resolve any doubts in favor of the ordinance's constitutionality. *See Ellis v. Social Servs. of Dep't of Church of Jesus Christ of Latter–Day Saints*, 615 P.2d 1250, 1255 (Utah 1980).

## I. Substantive Due Process

■■■ Sandy Hills first argues that Sandy City's amendment of the development code to rezone, or downzone, the rear acreage violated Sandy Hills's substantive due process rights[7] under the Fifth Amendment to

---

Interestingly, the record shows that the road had been previously barricaded about three years before placement of the barricade at issue. Apparently, when a contractor was asphalting the road on the property leading from 1055/1075 East, it removed the earlier barricade, prompting the city to issue the current barricade order later. The existence of a previous barricade at least places in question the continuous use of the road on the property "as a public thoroughfare" for at least 10 years. *See id.*

5. As we have stated, Sandy Hills asserted a facial challenge to the ordinance before the trial court. Sandy Hills then maintained that course on appeal. Its reply brief clarifies the facial nature of its challenge, and its counsel directly declared this to be a facial challenge in oral argument before this court.

Aside from shaping our analysis, this posture also disposes of any ripeness and futility arguments made by the parties. Regarding a facial—as opposed to an as-applied—attack, the challenger need not "seek a final decision regarding the application of the regulation to the property at issue before the government entity charged with its implementation." *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 686 (9th Cir.1993).

6. A city council acts within its legislative function when passing a zoning or rezoning ordinance. *See Sandy City v. Salt Lake County*, 827 P.2d 212, 220 (Utah 1992); *Crestview–Holladay Homeowners Ass'n v. Engh Floral Co.*, 545 P.2d 1150, 1152 (Utah 1976); *Naylor v. Salt Lake City Corp.*, 17 Utah 2d 300, 301–03, 410 P.2d 764, 765–66 (1966); *Salt Lake City v. Western Foundry & Stove Repair Works*, 55 Utah 447, 452, 455, 187 P. 829, 830–31, 832 (1920); *see also* 3 Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning & Planning* § 27A.04[3], at 27A–35 n. 39 (1997) ("In *Bird v. Sorenson*, 16 Utah 2d 1, 394 P.2d 808 (1964), the Supreme Court of Utah termed rezonings 'administrative' for purposes of holding them to be unfit subjects for referendum. For all other purposes, however, rezonings in Utah are characterized as legislative.").

7. " 'Substantive due process, as opposed to procedural due process, addresses the "essence of state action rather than its modalities; such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible." ' " *L.A. Ray Realty v. Town Council of Cumberland*, 698 A.2d 202, 211 (R.I. 1997) (citations omitted).

the United States Constitution.[8] In particular, Sandy Hills contends the downzoning is an invalid use of the city's police power because the downzoning did not rationally promote legitimate goals regarding the public's health, safety, or general welfare and was economically "unduly oppressive" to Sandy Hills.[9]

■ "It is established that an owner of property holds it subject to zoning ordinances enacted pursuant to a [city's] police power." *Western Land Equities, Inc. v. City of Logan*, 617 P.2d 388, 390 (Utah 1980). At the time Sandy City acted in this case, cities were authorized by Utah statute to enact ordinances that "are necessary and proper to provide for the safety and preserve the health, and promote the prosperity, improve the morals, peace and good order, comfort and convenience of the city and the inhabitants thereof, and for the protection of property therein." Utah Code Ann. § 10–8–84 (1973).[10] In addition, at the time Sandy City acted, it was specifically authorized by statute

> to regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings,

structures and land for trade, industry, residential or other purposes.

*Id.* § 10–9–1 (1973) (repealed 1992).[11]

■ Generally, "a zoning ordinance or other police power land use restriction must be reasonably related to serving the public health, safety or general welfare. If a land use restriction is unreasonable or irrational, it may be found to violate the substantive component of the due process clause." 1 Kenneth H. Young, *Anderson's American Law of Zoning* § 3A.04 (4th ed. 1996) (footnotes omitted); *see also Patterson v. Utah County Bd. of Adjustment*, 893 P.2d 602, 606 (Utah Ct.App.1995) ("All ... ordinances enacted through the exercise of police power are considered valid unless they 'do not rationally promote the public health, safety, morals and welfare.'" (Citation omitted.)).

■ However, if an ordinance "could promote the general welfare; or even if it is reasonably debatable that it is in the interest of the general welfare" we will uphold it. *Marshall v. Salt Lake City*, 105 Utah 111, 121, 141 P.2d 704, 709 (1943); *see also Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926) ("If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control."). "The selection of one method of solving the problem in preference

---

8. The Fifth Amendment prohibits the government from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. V.

9. The sole case cited by Sandy Hills regarding its substantive due process analysis is a Washington case, *see Presbytery of Seattle v. King County*, 114 Wash.2d 320, 787 P.2d 907 (1990), which seems to apply a higher standard of scrutiny than Utah does. Apparently, Washington courts look at whether the regulation uses means reasonably necessary to achieve a legitimate public goal, *see id.*, 787 P.2d at 913; whereas, as we describe in the text, Utah courts look at whether the regulation uses means that within reason debatably achieve the legitimate public goal. With the wealth of Utah law on this subject, we reject Sandy Hills's attempt to import a different standard from a different jurisdiction.

10. This section remains substantially the same today. *See* Utah Code Ann. § 10–8–84 (1996).

11. This section appears to have been replaced by Utah Code Ann. § 10–9–102 (1996), which reads:

> To accomplish the purpose of this chapter, and in order to provide for the health, safety, and welfare, and promote the prosperity, improve the morals, peace and good order, comfort, convenience, and aesthetics of the municipality and its present and future inhabitants and businesses, to protect the tax base, secure economy in governmental expenditures, foster the state's agricultural and other industries, protect both urban and nonurban development, and to protect property values, municipalities may enact all ordinances, resolutions, and rules that they consider necessary for the use and development of land within the municipality, including ordinances, resolutions, and rules governing uses, density, open spaces, structures, buildings, energy efficiency, light and air, air quality, transportation and public or alternative transportation, infrastructure, public facilities, vegetation, and trees and landscaping, unless those ordinances, resolutions, or rules are expressly prohibited by law.

to another is entirely within the discretion of the [city]; and does not, in and of itself evidence an abuse of discretion." *Phi Kappa Iota Fraternity v. Salt Lake City,* 116 Utah 536, 544, 212 P.2d 177, 179 (1949). These rules apply to rezoning decisions as well as to original zoning decisions. *See Crestview–Holladay Homeowners Ass'n v. Engh Floral Co.,* 545 P.2d 1150, 1152 (Utah 1976) (upholding rezoning rationally related to legitimate goals as valid exercise of city's legislative discretion); *Naylor v. Salt Lake City Corp.,* 17 Utah 2d 300, 303, 410 P.2d 764, 766 (1966) (same); *Salt Lake City v. Western Foundry & Stove Repair Works,* 55 Utah 447, 455, 187 P. 829, 830–31, 832 (1920) (same); *see also* 8 J. Jeffrey Reinholtz & Timothy P. Bjur, *McQuillin's Law of Municipal Corporations* § 25.93, at 356–57 (3d ed. 1991) ("The presumption of validity applicable to zoning ordinances is applicable also to rezoning ordinances.... Where the reasonableness and propriety of the rezoning are at least debatable a court will not disturb the rezoning." (Footnotes omitted.)); 1 Young, *supra,* § 3.14, at 116 (same). Thus, we will sustain the due process validity of a rezoning ordinance so long as "it is reasonably debatable that it is in the interest of the general welfare." *Marshall,* 141 P.2d at 709; *see also* 3 Ziegler, *supra,* § 27A.03, at 27A–15 (phrasing inquiry as whether "the reasonableness of the action is 'fairly debatable' "). We will certainly not substitute our judgment on zoning policy for that of the city's legislative body. *See Crestview–Holladay Homeowners Ass'n,* 545 P.2d at 1152.

 In reviewing this facial substantive due process challenge, we focus not on the ordinance's alleged or potential effects, but on the ordinance itself and the reasons given by Sandy City for its enactment. *See Keystone Bituminous Coal Ass'n v. DeBen-*

*edictis,* 480 U.S. 470, 495–96, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987) (focusing on whether " 'mere enactment' " violates Constitution in reviewing facial challenge (citation omitted)); *Village of Euclid,* 272 U.S. at 388–90, 47 S.Ct. at 118–19 (focusing on ordinance and reasons given for its passage in reviewing facial challenge); Mandelker et al., *supra,* § 1.04, at 1–10 ("A law is 'facially' unconstitutional if a court can determine its invalidity simply by reading its terms. The court need not know what the effect of the law as administered has been."). If the ordinance and the stated policies and reasons underlying it do, within reason, debatably promote the legitimate goals of increased public health, safety, or general welfare, we must allow Sandy City's legislative judgment to control.[12] *See Village of Euclid,* 272 U.S. at 388, 47 S.Ct. at 118; *Marshall,* 141 P.2d at 709; *cf. Patterson,* 893 P.2d at 608 (" 'A generalized exposition of overall standards or policy goals suffices to direct the inquiry and deliberation of the zoning authority, and to permit judicial review of its decision.' " (Citation omitted.)).

We now inventory some of the stated reasons and policies upon which the downzoning was based, following each with legal authority and analysis supporting its status as a legitimate goal promoting public health, safety, or general welfare.

First, regarding the need to limit the amount of property zoned commercial in the area, Sandy City noted at various times that "the existing 364[,]500 square feet of retail space exceeds the Commercial/Industrial Study recommendation that Community Commercial should not exceed 250,000 square feet retail space"; "[w]ith the existing commercial it appears there may be commercially zoned land and developed commercial square footage in this area for this type of

---

12. We are further mindful that in performing its legislative function, the city council is presumed to

 have wide knowledge of the various conditions and activities in the county bearing on the question of proper zoning, such as the location of businesses, schools, roads and traffic conditions, growth in population and housing, the capacity of utilities, the existing classification of surrounding property, and the effect that the proposed reclassification may have on these

things and upon the general orderly development of the [city]. In performing their duty it is both their privilege and obligation to take into consideration their own knowledge of such matters and also to gather available pertinent information from all possible sources and give consideration to it in making their determination.

*Gayland v. Salt Lake County,* 11 Utah 2d 307, 310–11, 358 P.2d 633, 636 (1961).

commercial use development"; "there is [already] ample commercial zoning to make an attractive center"; and even if the property was downzoned, "over 6 acres of commercial would exist along 700 East." This reason given to support the downzoning here—that there is already enough commercial development in the area—has been approved by our supreme court, which has stated: "The foundational reason for zoning is to regulate the growth and development of the city in an orderly manner. Among the objectives to be served is ... the prevention of undue concentrations of people in certain areas under undesirable conditions." *Naylor*, 410 P.2d at 765. The city is within its rights to establish " 'districts into which business, commerce, and industry shall not intrude, and to fix certain territory for different grades of [commercial or residential] concerns.' " *Marshall*, 141 P.2d at 709 (citation omitted).

■ The exclusion of commercial development from Sandy Hills's rear acreage is one reasonably debatable way of preventing "undue concentrations" of business owners, vendors, delivery people, and business patrons in that area. And, such undue concentrations debatably might be considered "undesirable" where the rear acreage is surrounded on three sides by homes.[13] This conclusion is supported by statements of the United States Supreme Court, adopted by our supreme court:

> "[T]he exclusion of buildings devoted to business, trade, etc., from residential districts, bears a rational relation to the health and safety of the community. Some of the grounds for this conclusion are promotion of the health and security from injury of children and others by separating dwelling houses from territory devoted to trade and industry; suppression and pre-

vention of disorder; facilitating the extinguishment of fires, and the enforcement of street traffic regulations and other general welfare ordinances; aiding the health and safety of the community.... Another ground is that the construction and repair of streets may be rendered easier and less expensive, by confining the greater part of the heavy traffic to the streets where business is carried on.... The establishment of such districts or zones may, among other things, prevent congestion of population, secure quiet residential districts, expedite local transportation, and facilitate the suppression of disorder, the extinguishment of fires, and the enforcement of traffic and sanitary regulations.... The exclusion of places of business from residential districts is not a declaration that such places are nuisances or that they are to be suppressed as such, but it is a part of the general plan by which the city's territory is allotted to different uses, in order to prevent, or at least to reduce, the congestion, disorder, and dangers which often inhere in unregulated municipal development."

*Id.* at 708 (quoting *Village of Euclid*, 272 U.S. at 391–93, 47 S.Ct. at 119–20).

Second, the city council reasoned that the subdivisions around the rear acreage were undergoing "deteriorating housing and high turnover of owners," and, thus, downzoning the property to permit "additional residential development ... might stab[i]lize the neighborhood." The commission agreed that "the area has experienced high owner turnover in existing homes recently. The recommended zoning could add stability to the area." This reasoning is consistent with a valid use of the police power, which

> permits restriction upon the right of the owner of a specific tract of land when the

---

13. This discussion then supports and subsumes another legitimate reason Sandy City gave for its decision: The rear acreage is surrounded on three sides by residential development; and downzoning the rear acreage to a classification somewhat more intensive than single-family residential "would be an appropriate buffer." Regarding this reason, we recognize that a basic purpose of traditional zoning is " 'to minimize conflicts between incompatible uses.' " *Patterson v. Utah County Bd. of Adjustment*, 893 P.2d 602, 607 (Utah Ct.App.1995) (citation omitted);

*see also Marshall v. Salt Lake City*, 105 Utah 111, 122, 141 P.2d 704, 709 (1943) (" 'It is a fundamental theory of the zoning scheme that it shall be for the general good to secure reasonable neighborhood uniformity, and to exclude structures and occupations which clash therewith.' " (Citation omitted.)). We cannot say that downzoning from commercial to residential a tract of land substantially surrounded by residential development is not one rational way to " 'minimize conflicts between incompatible uses.' " *Patterson*, 893 P.2d at 606 (citation omitted).

legislative body has a reasonable basis to believe that it will conserve the values of other properties and encourage the most appropriate use thereof. . . . [Z]oning regulations which promote the integrity of a neighborhood and preserve its residential character are related to the general welfare of the community and are valid exercises of legislative power. The use of private property can be restricted for the public purpose of preventing the deterioration of a neighborhood and the depreciation of property values that lead to a blighted condition.

83 Am.Jur.2d *Zoning & Planning* §§ 76, 77 (1992) (footnotes omitted); *see also Neuzil v. City of Iowa City*, 451 N.W.2d 159, 166 (Iowa 1990) ("[T]he city found that downzoning would help maintain the current property values in the area—a consideration that bears a substantial relationship to the public's health, safety, welfare and comfort."). Thus, Sandy City's goal of shoring up a declining residential area is a legitimate one. We are surely not in a position to say that creating an opportunity for adjacent development of new housing is not a reasonable way to accomplish that aim.

Third, we address just one other set of objectives and grounds Sandy City gave for this downzoning—those related to traffic concerns.[14] In its memorandum to the city council and commission, the planning department stated that the downzoning was supported by the following concerns:

4. the stub roads into the parcel create traffic circulation problems in the existing residential and commercial development;

5. traffic from the area when developed should enter and leave through the existing residential subdivision streets and not travel through the commercial center; and

6. good access to commercial or multiple unit development behind the existing commercial development would be difficult.

The planning department reiterated these concerns in a city council/commission meeting. Later, when the commission voted to recommend the downzoning to the city council, it noted that residential zoning would work because "there are adjacent stub streets."

■ Our research shows that "among the legitimate objectives to be served by zoning 'is . . . making provision for safe and efficient transportation.'" *Patterson*, 893 P.2d at 606 (citation omitted); *accord Naylor*, 410 P.2d at 765; *see also* 1 Young, *supra*, § 7.09, at 746 ("[I]t is clear that the flow of traffic is a legitimate concern of a municipal legislative body in its enactment of zoning regulations. The purpose of relieving or preventing traffic congestion has been cited in support of regulations which . . . restrict commercial use."). A less intensive use such as residential is, debatably, one reasonable way to ease traffic flow around and through the property, in accord with Sandy City's legitimate police power goal. We therefore conclude that the downzoning is not irrational on this basis.

■ We finally address Sandy Hills's substantive due process argument that Sandy City's downzoning action was invalid because it is economically "unduly oppressive" to Sandy Hills. In light of our ability to identify several legitimate goals that, within the realm of reasonable debate, promote valid police power concerns supporting this downzoning, we note even when land value "is substantially diminished as a result of zoning, that fact alone will not be deemed a sufficient ground for finding the regulation arbitrary and capricious. Such losses gener-

14. Sandy Hills has also attacked other of Sandy City's reasons for the downzoning. However, we need not address them because the reasons we do address are sufficient to show proper use of police power. *Cf. Parranto Bros. v. City of New Brighton*, 425 N.W.2d 585, 589 (Minn.Ct.App. 1988) ("[In takings cases,] [t]here is no requirement . . . that all of the city's stated interests be . . . advanced by its zoning decision. The other stated interests were . . . advanced.").

Additionally, Sandy Hills makes much of what it considers to be an inconsistency between one of the effects of the downzoning—leaving a strip of commercial about 200 feet deep—and the comprehensive plan, which recommends a policy precluding development of strip buildings. Sandy Hills asserts this leads to the conclusion that the downzoning was arbitrary and capricious. We have reviewed this assertion and determine it to be without merit; therefore, we decline to address it. *See State v. Carter*, 776 P.2d 886, 888–89 (Utah 1989) (stating we need not address meritless issues).

ally are deemed to be simply the uncompensated burdens one must accept to live in an ordered society." 1 Ziegler, *supra*, § 3.04[3], at 3–25; *see Gibbons & Reed Co. v. North Salt Lake City*, 19 Utah 2d 329, 334–35, 431 P.2d 559, 563 (1967) ("[V]alue 'alone' would not be enough to classify an action arbitrary. Other factors must also be taken into consideration."); *Western Foundry & Stove Repair Works*, 187 P. at 831, 832 ("It is to be remembered that we are dealing with one of the most essential powers of government, one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily."); *see also Neuzil*, 451 N.W.2d at 164 (stating that in substantive due process analysis "the court's prime consideration is the ordinance's general purpose and not the hardship of an individual case"); 1 Young, *supra*, § 3.26, at 161 ("Where the zoning ordinance appears to the court to be a generally sensible one, even a serious reduction in value may not be sufficient to persuade the court that the ordinance is arbitrary and unreasonable. Thus, an ordinance which changed the zone classification of certain land from business to residential was upheld even though, as business property, the land was worth twice as much." (Footnotes omitted.)). Indeed, "[z]oning and rezoning present perplexing problems of economic and environmental gain and loss. While some gain, others lose. It is the Legislature which must strike the proper balance." *Sierra Terreno v. Tahoe Reg'l Planning Agency*, 79 Cal.App.3d 439, 144 Cal.

Rptr. 776, 777 (1978); *see also* Mandelker, *supra*, § 2.03[3] (" 'The act of legislating necessarily entails political trading, compromise, and ad hoc decision making which, in the aggregate, produce policies that at least approximate a fair and equitable distribution of social resources and obligations.' " (Citation omitted.)).

In sum, like the *Euclid* Court, we can only conclude:

> If these reasons, thus summarized, do not demonstrate the wisdom or sound policy in all respects of [the downzoning] which we have indicated as pertinent to the inquiry, at least, the reasons are sufficiently cogent to preclude us from saying, as it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.

*Village of Euclid*, 272 U.S. at 395, 47 S.Ct. at 121. Thus, on its face, the undisputed language of the ordinance and the reasons given for the ordinance support Sandy City's downzoning action. The trial court therefore correctly granted summary judgment for Sandy City on this substantive due process claim.

## II. Takings

Sandy Hills next contends that, even if the downzoning was a valid exercise of the police power,[15] Sandy City effectively obliterated all economically viable use of the rear acreage, leaving the rear acreage virtually worthless.[16] Thus, Sandy Hills argues,

---

**15.** It is true that " '[t]he constitutional guarantee of just compensation for the taking ... of private property for public use is in no way affected by the fact that the expropriator ... exercis[ed] the police power.' " *Colman v. Utah State Land Bd.*, 795 P.2d 622, 627 (Utah 1990) (citation omitted).

**16.** It appears Sandy Hills argues only that the rear acreage was taken, which seems to ignore a well-settled principle of takings law:

> Because our test for regulatory takings requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property "whose value is to furnish the denominator of the fraction." In *Penn Central*, the Court explained:

>> " 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature of the interference with rights in the parcel as a whole...."

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987) (citations & emphasis omitted). However, even were we to assume the rear acreage is "a distinct segment of property for 'takings' purposes," Sandy Hills has not met its "heavy burden of sustaining a facial challenge" to the ordinance. *Id.* at 501, 107 S.Ct. at 1250. Whether regarded as the entire property or the

Sandy City has wrought a taking of the rear acreage under the Takings Clause of the Fifth Amendment to the United States Constitution, and must pay just compensation to Sandy Hills.

■ The Takings Clause, which applies to the states through the Fourteenth Amendment, declares: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. One of the Clause's primary purposes is " 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Dolan v. City of Tigard*, 512 U.S. 374, 384, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994) (citation omitted).

■ Two opposing tenets thus drive takings jurisprudence: "on one hand, respect for the property rights of individuals; on the other, recognition that the government retains the ability, in furtherance of the interests of all citizens, to regulate an owner's potential uses of land." *Zealy v. City of Waukesha*, 201 Wis.2d 365, 548 N.W.2d 528, 531 (1996). However, "[z]oning laws are, of course, the classic example, which have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 125, 98 S.Ct. 2646, 2659–60, 57 L.Ed.2d 631 (1978).

■ With this background in place, we observe, once again, that the scope of our review in this case is significantly narrowed by the fact that Sandy Hills brings but a facial challenge. This posture is crucial because there is a fundamental difference "between a claim that the mere enactment of a

statute constitutes a taking and a claim that the particular impact of government action ... requires the payment of just compensation." [17] *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494, 107 S.Ct. 1232, 1246, 94 L.Ed.2d 472 (1987). Regarding facial challenges, the United States Supreme Court has stated:

" '[T]his Court has generally "been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." Rather, it has examined the "taking" question by engaging in essentially ad hoc, factual inquiries that have identified several factors— such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action—that have particular significance.'

"These 'ad hoc, factual inquiries' must be conducted with regard to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances.

"Because appellees' taking claim arose in the context of a facial challenge, it presented no concrete controversy concerning ... application of the Act to [a] ... specific parcel[ ] of land. Thus, the only issue properly before the District Court and, in turn, this Court, is whether the 'mere enactment' of the ... Act constitutes a taking. *The test to be applied in considering this facial challenge is fairly straightforward. A statute regulating the uses that*

---

rear acreage alone, economically viable use and value remain.

**17.** Although Sandy Hills expressly admits the facial nature of its challenge, it almost exclusively cites cases analyzing as-applied challenges, which are all inapposite to this case. *See Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1173–83 (Fed.Cir.1994) (permit denial); *Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1562–73 (Fed.Cir.1994) (same); *Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal*, 922 F.Supp. 1131, 1133–53 (W.D.Va. 1996) (regarding town's refusal to provide necessary sewer service for development); *Bowles v.*

*United States*, 31 Fed.Cl. 37, 39–53 (1994) (permit denial); *K & K Constr., Inc. v. Department of Natural Resources*, 217 Mich.App. 56, 551 N.W.2d 413, 415–21 (1996) (permit denial).

*Kempf v. City of Iowa City*, 402 N.W.2d 393 (Iowa 1987), did involve a downzoning held to be a taking. *See id.* at 400–01. However, in that case, immediate development of the specific land at issue was already in progress, and the city revoked the plaintiff's building permit to effect the zoning. *See id.* Thus, *Kempf* is also inapposite. In this case, Sandy Hills has not in any tangible way begun to develop the rear acreage.

*can be made of property effects a taking if it 'denies an owner economically viable use of his land....'"*

Petitioners thus face an uphill battle in making a facial attack on the Act as a taking.

*Id.,* 107 S.Ct. at 1247 (emphasis added) (citations omitted).[18]

18. An alternative basis for a facial takings challenge is to show that the regulation does not " '*substantially* advance[ ] legitimate state interests.' " *Dolan v. City of Tigard,* 512 U.S. 374, 385, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994) (emphasis added) (citation omitted); *see also Stephans v. Tahoe Reg'l Planning Agency,* 697 F.Supp. 1149, 1152 (D.Nev.1988). Of course, we have already decided that it is fairly debatable that Sandy City's regulation of the rear acreage advances legitimate state goals. However, the takings analysis deletes "reasonably debatable" or "fairly debatable" and adds the word "substantially" before "advance." Thus, this standard appears to be more stringent than the standard against which we measured the substantive due process validity of the ordinance. *See* 1 Ziegler, *supra,* § 6.04, at 6–14. Nonetheless, in its takings analysis, Sandy Hills has not argued that the ordinance does not " 'substantially advance[ ] legitimate state interests.' " *Dolan,* 512 U.S. at 385, 114 S.Ct. at 2316 (citation omitted). We therefore do not address that basis for showing a facial taking.

We note that, in its substantive due process analysis, Sandy Hills did argue in passing that "it is difficult to ascertain or discern any *substantial* relation to public health, welfare or safety wrought by the downzoning." However, this cursory statement with no meaningful legal analysis is insufficient to raise this basis for takings under our appellate rules and does not carry Sandy Hills's burden. *See* Utah R.App.P. 24(a)(9) (requiring brief to contain sufficient legal argument).

19. Sandy Hills also argues that it should be able to show less than total diminution and that we should consider its investment-backed expectations, along with the other two prongs of the takings analysis. *See supra* p. 257 (quoting *Keystone Bituminous Coal Ass'n,* 480 U.S. at 495, 107 S.Ct. at 1246). This is not the test for a facial challenge. *See id.* at pp. 257–58.

We further note that, although Sandy Hills may have bought the property intending to eventually develop the entire parcel commercially, [i]t must be realized that zoning is not a static thing which once established becomes set in concrete forever. To require adherence to a plan formulated [many] years ago without any more reason than that the ordinance had been so long established would be quite impractical and in some instances would frustrate attempts

■ Congruent with this test, Sandy Hills does argue it has been denied "economically viable use" of the rear acreage, rendering the rear acreage practically valueless.[19] *Id.* To support this argument, it has included some affidavits in the record. However, in determining that the rear acreage has not been rendered practically valueless, we need not look beyond the affidavit of appraiser, Jerry R. Webber.[20] He averred that the

to put into effect necessary changes to accomplish the objectives zoning was designed to serve. It is obvious that there must be some pliability so that in performing its function the [council] may keep abreast of changing conditions as life courses onward and meet the varying needs of the growing city.

*Naylor,* 410 P.2d at 766; *see also Western Foundry & Stove Repair Works,* 187 P. at 830 ("One step in the right direction on the part of the city government ought not to be held as conclusive that in the course of time it will not take another."). Indeed, "[a] property owner has no vested right to 'continuity of zoning....' A property owner has no vested right in the business classification of his property.... A person who purchases land in reliance upon its current zoning restrictions acquires no right that the restrictions remain the same." 1 Kenneth H. Young, *Anderson's American Law of Zoning* § 4.28, at 325, 327 (4th ed. 1996).

Additionally, in response to Sandy Hills's frequent complaint that it has been denied the "highest and best use" of the rear acreage, we note it is well-settled that this is not a relevant consideration in either our substantive due process or takings analysis. *See, e.g., Sprenger Grubb & Assocs. v. Hailey,* 127 Idaho 576, 903 P.2d 741, 746–47 (1995).

20. Although this affidavit is in the record's table of contents, it is missing from the record. Our description of Webber's averments is pieced together from other documents in the record.

Two other affidavits presented to the trial court by Sandy Hills are generally not helpful to Sandy Hills because (1) the affiants tend to aver opinions on policy matters that have been left by state law to be determined by Sandy City; and (2) the affiants tend to base their opinions that the rear acreage has no remaining economically viable use both on Sandy Hills's own decision not to allow access to potential residential development through its commercially zoned acreage, and on purely hypothetical constructs, reflecting conditions that may not necessarily occur. *Cf. C.F. Lytle Co. v. Clark,* 491 F.2d 834, 838 (10th Cir. 1974) (stating, in case in which landowner was denied building permit, that "[a] landowner cannot create his own hardship and then require that zoning regulations be changed to meet that hardship"); *Marshall v. Board of County Comm'rs,* 912 F.Supp. 1456, 1473 (D.Wyo.1996) (stating, in case in which regulation decreased

rear acreage's value before the downzoning was $1,355,000, and after the downzoning was $775,000.[21] On its face, property worth $775,000 can hardly be deemed valueless, with no viable economic use.[22]

 Certainly, with a total decrease of $580,000, at the time of the appraisal, the property as zoned R–2–10 lost about 43% of the value it had when zoned C–2. Even so, "mere diminution in value is insufficient to meet the burden of demonstrating a taking by regulation." *Cornish Town v. Koller*, 817 P.2d 305, 312 (Utah 1991). As the Supreme Court has declared, " 'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law....' " *Penn Central Transp. Co.*, 438 U.S. at 124, 98 S.Ct. at 2659 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922)). Indeed, regulations causing much greater diminution in value than that found here have been upheld against takings challenges. *See, e.g., Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384, 47 S.Ct. 114, 117, 71 L.Ed. 303 (1926) (75% diminution in value); *Hadacheck v. Sebastian*, 239 U.S. 394, 394, 36 S.Ct. 143, 143, 60 L.Ed. 348 (1915) (92.5% diminution); *Pace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1031 (3d Cir. 1987) (89.5%); *William C. Haas & Co. v. City of San Francisco*, 605 F.2d 1117, 1121 (9th Cir.1979) (95%); *Sierra Terreno v. Ta-hoe Reg'l Planning Agency*, 79 Cal.App.3d 439, 144 Cal.Rptr. 776, 777 (1978) (81%).

Consequently, in this facial challenge, we conclude the rear acreage retains some economically viable use and value. The trial court therefore correctly decided on the undisputed facts presented by Sandy Hills that the downzoning did not effect a taking.

## CONCLUSION

We conclude that Sandy City's decision to downzone the rear acreage was debatably a reasonable way to promote legitimate government goals. The trial court therefore correctly determined Sandy City did not violate Sandy Hills's substantive due process rights. Further, we conclude the downzoning did not remove all economically viable use and value from the rear acreage. The trial court was thus correct in ruling that the downzoning did not effect a taking. Accordingly, we affirm.

WILKINS, Associate P.J., and GREENWOOD, J., concur.

---

number of residential lots available for development, that landowner's "own statements do not lead logically to the conclusion that his investment backed expectations have been destroyed in their entirety").

21. Having no access to Webber's actual affidavit, we rely on Sandy Hills's brief to tell us that he averred "the downzoning reduced the value of the rear acreage by $500,000." Thus, we assume his appraisal dealt only with the rear acreage and not the entire property. This strengthens our conclusion that no taking occurred—the rear acreage alone was apparently worth $775,000, without taking into account the worth of the commercially zoned acreage. Thus, the worth of the property as a whole, which is our denomina-tor, *see, supra* note 16, must have been substantially more than $775,000.

22. The question regarding whether a regulation denies "all economically viable use" centers on the range of remaining allowable uses, not former uses. *See Stephans*, 697 F.Supp. at 1152. Of interest, in facial takings cases, some courts have held that—per se—the fact that zoning allows residential uses means the owner *has* economically viable use, and, therefore, no taking has occurred. *See id.* (citing *Agins v. City of Tiburon*, 447 U.S. 255, 262–63, 100 S.Ct. 2138, 2142–43, 65 L.Ed.2d 106 (1980), and *Lake Nacimiento Ranch Co. v. County of San Luis Obispo*, 841 F.2d 872, 877 n. 3 (9th Cir.1987)).